THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JIMMIE LEE SCHLEMM, Defendant-Appellant.

Fourth District   No. 15440

Opinion filed March 20, 1980.

TRAPP, J., concurring in part and dissenting in part.

Richard J. Wilson, Jeff Justice, and Jeffrey D. Foust, all of State Appellate Defender's Office, of Springfield, for appellant.

Nolan Lipsky, State's Attorney, of Petersburg (Marc D. Towler and Gary J. Anderson, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

Defendant, Jimmie Lee Schlemm, was convicted by the circuit court of Menard County of two counts of murder and two counts of concealment of homicide. Defendant was sentenced to 38 years for each murder and 10 years for each concealment, with all sentences running consecutively. On appeal he asserts error in the trial court's (1) refusal to suppress evidence seized during various searches, (2) admission of evidence previously ordered suppressed, (3) imposition of consecutive sentences, and (4) imposition of extended terms of imprisonment for the two convictions of concealment of a homicide.

Charges against defendant for the murders and concealment of the homicidal deaths of Eugene Ferry and John Teeter were filed on June 5 and 8, 1978, respectively. A jury trial concerning all of the charges began on November 20, 1978. There evidence was presented that the two men had been missing from March 20, 1978, until their bodies were found tied to bricks at the bottom of the Sangamon River. Ferry's body was found on April 9, 1978, but Teeter's was not discovered until June 6, 1978.

Proof of defendant's guilt was all circumstantial. A law enforcement officer testified at trial that on April 11, 1978, he searched a trailer where

defendant had been living and found (1) bullet holes in the trailer, (2) blood stains and human hair on the floor, both later shown to be similar to that of Teeter, and (3) possessions later shown to have belonged to Ferry. He also identified microphones and microphone cords as having been found in the trailer. These cords resembled those tying Ferry's body in the river. A police technician testified that a cord found on that body was able to make an electrical connection to one of the microphones only because solder had been placed on the plug. The technician also stated that the socket on the microphone showed tool marks corresponding to the tool used to modify the plug on the cord but could not positively state that the same tool left both impressions. Evidence was also presented that many of the victims' personal effects and clothing were found in the search of the house of an aunt of defendant, where defendant had been staying.

In addition to the evidence found in the searches, several other pieces of evidence linked defendant to the murders. Defendant's own testimony, as well as the testimony of other witnesses, indicated that defendant (1) drove Teeter's rented car from Springfield to Jacksonville, Illinois, and abandoned it there the morning after Teeter and Ferry disappeared (although an attempt had been made to sponge down the car, it still had a putrid odor and was found to contain human blood and hair specimens), (2) had fired his gun on the bloodstained Cascade Bridge which was located near the place where the bodies were found, and (3) had given his attorney a tooth belonging to Teeter which his attorney in turn gave to police officers.

In his testimony, defendant stated that (1) shells from his gun were found on the Cascade Bridge merely because he had done some target shooting there; (2) he did not know how Teeter's tooth got in his trailer; (3) the bullet holes in his home were the result of an accidental misfire; (4) he was merely storing the personal effects of Teeter and Ferry as they had asked him to do; and (5) he had attempted to get rid of the car only because an individual named "D. C." had paid him to do so. Witnesses who had been stated by defendant to be friends of "D. C." denied knowing anyone having that name.

Defendant's first claim of error arises from the court's denial in part of his pretrial motion to suppress the evidence seized in searches of the trailer and the house of defendant's aunt.

At the suppression hearing, evidence was presented that after Ferry's body was found police officers were informed by a person they believed to be Ferry's mistress that: (1) she had last seen Ferry and Teeter on March 19, 1978, when they purported to be headed for a meeting with defendant; and (2) she spoke with Ferry on the telephone on March 20, 1978, and he said he had spent the night with defendant. With this information the officers on April 11, 1978, contacted the landlord of

defendant's trailer. The landlord testified to the following sequence of events. Defendant who had been in arrears on rent called him on April 10 and said that he, defendant, was moving out that night and would send the landlord the key. The landlord then placed a newspaper advertisement listing the trailer as being for rent. On April 11, the officers requested permission to search the trailer. Upon the landlord's explanation of the situation, the officers told him that he had authority to authorize their entry, so he did. The tenant had not returned the key, but the landlord stated that it was not unusual for departing tenants to fail to do this. As the landlord's key had been given to a repairman, he broke a window and they entered the trailer. Upon entering they were surprised to find that it appeared to be substantially furnished. After a brief view of the interior, the officers stated that they should get a warrant and they all left the trailer. Defendant testified, admitting telling the landlord that he was moving out but said that he told the landlord he would do so at the end of the month.

■■ A warrant was later obtained and evidence was seized. The trial court suppressed items seized which were not listed in the warrant but refused to suppress those which were so listed. Defendant maintains that all evidence should have been suppressed because the affidavit for the search warrant was insufficient and because, in any event, the search was the fruit of an entry in violation of defendant's fourth amendment rights. We dispose of the first contention summarily. The complaint for the warrant was based upon an officer's statement of seeing bullet holes in the trailer and blood on the floor. Defendant argues that a showing would have to be made that the officer was a ballistics expert for him to identify the holes as bullet holes, citing *People v. Fiorita* (1930), 339 Ill. 78, 170 N.E. 690, where it was held that a non-ballistics-expert police officer could not make ballistic comparisons at trial. Here, the issue was probable cause, and an ordinary police officer could properly conclude that the holes were made by bullets. The complaint showed probable cause.

■■ The question of the propriety of the officers' original entry into the trailer and the short search they then conducted presents a more complicated problem. It is well established that during the pendency of a lease a landlord cannot consent to a search of the leased premises, and that apparent authority alone is insufficient for a third party to consent to a warrantless search. (*Chapman v. United States* (1961), 365 U.S. 610, 5 L. Ed. 2d 828, 81 S. Ct. 776; *People v. Bankhead* (1963), 27 Ill. 2d 18, 187 N.E.2d 705; *People v. Miller* (1968), 40 Ill. 2d 154, 238 N.E.2d 407.) But despite this general rule a "common authority doctrine" has emerged, which may be viewed as an exception to the general rule. In *United States v. Matlock* (1974), 415 U.S. 164, 39 L. Ed. 2d 242, 94 S. Ct. 988, it was held that a woman who shared a bedroom with defendant could consent to a

search which resulted in the seizure of stolen bank money. The court stated, "[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." (415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993.) The United States Supreme Court went on to explain "common authority" in a footnote where it stated:

> "Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, * * * but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the coinhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7. Accord, *People v. Stacey* (1974), 58 Ill. 2d 83, 317 N.E.2d 24 (holding a wife could consent to such a search).

As this court has recognized, the common authority must be based upon a genuine understanding between the parties, rather than contrived solely from property notions. In *People v. Baughman* (1977), 47 Ill. App. 3d 209, 361 N.E.2d 1149, this court held the State did not have power to consent to a search of the home which the State bought in anticipation of highway construction, since after the sale the former owners of the house were permitted to remain in the house temporarily by an oral understanding which did not contemplate that the parties would share any degree of common authority.

In the case on appeal, the issue is whether the trial court could properly have found that defendant conferred upon the landlord a common authority to allow others to view the trailer. On this point the trial court found *People v. Marino* (1972), 5 Ill. App. 3d 778, 284 N.E.2d 54, to be controlling. In that case defendant challenged a search warrant which was based upon evidence seized during a consensual search of his former residence. The owner of that residence told police that defendant no longer lived there but still stored some things at that residence, and the owner permitted the police to search. During their search police found that defendant had stored stolen goods there, and upon this information they obtained a search warrant for his new apartment. The warrant was upheld on appeal. *Marino* stands for the proposition that the owner of

property has a right to consent to a search after the parties have agreed to end a tenancy even though the former tenant has not yet removed all of his possessions.

■■ The trial court could properly have believed the landlord's testimony that defendant told him, he, the defendant, was moving out of the trailer on the night of that conversation. Such an assertion by defendant would not have created exactly the same type of common usage rights to the trailer that existed with reference to the premises in question in *Matlock* and *Marino*. But we conclude that such an assertion by defendant would, after the night of the proposed move, confer on the landlord authority to at least enter the trailer and to allow those accompanying him to do so with him. Clearly it would have enabled the landlord to reasonably believe that he had authority to do so. (See *Matlock*, 415 U.S. 164, 177 n.14, 39 L. Ed. 2d 242, 253 n.14, 94 S. Ct. 988, 996 n.14.) The evidence does not indicate that once the landlord and the officers were in the trailer, they took any action other than to view those things such as the blood-stained rug and bullet holes all within their plain sight upon their entering. Upon finding the trailer to be still occupied, the group retreated immediately and obtained a warrant to search the trailer. It is doubtful whether the group's conduct constituted a search. If it did, it would not have exceeded the authority impliedly given by defendant through his telephone conversation with the landlord. The trial court did not err in refusing to suppress the items in question.

The trial court refused to suppress any evidence seized at the home of defendant's aunt. The sole question as to this seizure was the sufficiency of the complaint to support issuance of the warrant. The complaint set forth information showing that (1) defendant was the last person to see the victims; (2) defendant had attempted to dispose of Teeter's blood-spattered car; (3) evidence linking defendant to the crimes had been found in the trailer and at Cascade Bridge; (4) defendant had been seen wearing a coat belonging to Teeter 45 days earlier; (5) his mistress had been given personal effects of the victims 14 days earlier by a friend of defendant who said he was storing them for defendant and asked the mistress to give them to defendant; (5) defendant and his mistress had been living at the aunt's house; (6) Teeter was missing; and (7) the circumstances of finding Ferry's body.

Defendant maintains that the complaint for this warrant failed to set forth that a crime had been committed and showed the information to be too stale to indicate probable cause that evidence of a crime, if any had been shown, would still be at the home.

The complaint was obviously sufficient to show probable cause that defendant had murdered Ferry and had at least battered Teeter. The issue of whether the information linking the offense to the house was too

stale requires more discussion. Although no hard and fast rules exist, the courts of this State have held that delays of 8 and 11 days between the time which contraband is seen by the affiant and the time the complaint is made are sufficiently close in time to establish probable cause (*People v. Montgomery* (1963), 27 Ill. 2d 404, 189 N.E.2d 327; *People v. McCoy* (1973), 10 Ill. App. 3d 1054, 295 N.E.2d 483). This is significant when one considers that one would not reasonably expect noncontraband items of mere evidentiary value, such as personal effects, to disappear as quickly as contraband items. Nor would one expect instrumentalities of an ongoing crime to disappear as quickly as instrumentalities of a single criminal act. Perhaps the test is best stated by Professor LaFave in his treatise, 1 LaFave, Search and Seizure §3.7(a), at 688 (1978):

> "Particularly when the crime under investigation is a prior murder, rape, burglary, robbery or the like, clearly not a continuing offense, and the desire is to search for the fruits, instrumentalities or evidence of that prior crime, the factor which is likely to emerge as the most important consideration is the nature of the property which is sought. Some objects are likely to be retained by the person committing such an offense for a substantial period, while others are likely to be disposed of promptly. * * *
>
> Obviously, a highly incriminating or consumable item of personal property is less likely to remain in one place as long as an item of property which is not consumable or which is innocuous in itself or not particularly incriminating."

We agree with Professor LaFave's test. As applied here, the continuing disappearance of Teeter suggested an ongoing crime. If defendant had worn Teeter's coat 45 days earlier he would be likely to have at least kept it. If the victims' effects had been stored 14 days earlier, some of them would still likely be in defendant's possession. Although defendant asserts that the complaint did not explicitly detail when the latter items were taken into the aunt's home, we deem that to be an overly technical objection (*United States v. Ventresca* (1965), 380 U.S. 102, 13 L. Ed. 2d 684, 85 S. Ct. 741). The trial court properly refused to suppress the items seized from the house.

The other contention of defendant bearing upon the convictions is a unique fourth amendment problem which has been raised for the first time on appeal. At the suppression hearing, the court had suppressed those items seized at the trailer which had not been listed in the search warrant for those premises. Among those items were the microphone cords similar to those found tied around Ferry's body and the microphone which was able to make an electrical connection with the cord actually identified as having been found on Ferry's body. As stated previously, the

cord and microphone made a connection only because of a modification, signs of which appeared on both the cord and microphone. During the course of trial, these and other items of little significance were tendered by the State and admitted into evidence without objection.

The question before this court thus becomes whether the admission of this evidence amounted to a constitutional error which would require reversal because it cannot be classified as "harmless beyond a reasonable doubt," or whether the error was merely one of State procedure in which case it would be waived by defendant's failure to raise it below. *People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.

Neither defendant's motion to suppress nor his argument in support thereof contended that items had been seized in the trailer that were obtained by officers searching areas beyond that necessary to execute the warrant. Rather, as here, he argued that the search was the unlawful fruit of an impermissible original entry and that the warrant was issued upon an insufficient complaint. No evidence indicated that the unlisted items were seized in areas not properly searched in execution of the warrant. Indeed several small items were listed in the warrant and a minute search would likely have been necessary to find them. Nevertheless, the trial court suppressed all items not listed on the warrant. Later, at trial, evidence introduced showed that the cords and microphone were found in places where it was permissible to search for the other items.

Had the motion to suppress been denied at the suppression hearing, and had this court determined that the evidence produced at that hearing did not justify denial of the suppression motion, this court could consider the evidence introduced at trial to uphold denial of the suppression motion. (*People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808.) In commenting upon the above doctrine, Professor LaFave has stated:

> "The notion that the trial record may be used by the appellate court to uphold a search or seizure notwithstanding the fact that the lower court erred in failing to suppress on the lesser amount of evidence produced at the pretrial hearing is an attractive one—after all, if it now appears that the fourth amendment was not violated, then why should the defendant be entitled to a windfall reversal of his conviction?" 3 LaFave, Search and Seizure §11.7(c), at 732 (1978).

By analogy to the *Braden* rule, we may conclude by looking at the entire record that the cords and microphone were not taken in violation of defendant's fourth amendment right. We are faced, nevertheless, with the problem of whether the procedure whereby the court first suppressed the evidence and then admitted it into evidence was violative of a constitutional right.

The effect of the trial court's admitting the evidence after it had been suppressed was to reconsider the ruling of suppression. Because under Supreme Court Rule 604(a) (73 Ill. 2d R. 604(a)) the order of suppression of evidence found to be seized in violation of fourth amendment rights is appealable, Illinois deems the trial court's unappealed order granting suppression to be the law of the case and holds reconsideration at trial to be error. (*People v. Taylor* (1971), 50 Ill. 2d 136, 277 N.E.2d 878; *People v. Roland* (1972), 5 Ill. App. 3d 53, 282 N.E.2d 500.) However, some other jurisdictions permit a trial court in the course of trial, under some circumstances, to reconsider an order of suppression even though that order was appealable. *United States v. Scott* (5th Cir. 1975), 524 F.2d 465; *United States v. Greely* (D.C. Cir. 1970), 425 F.2d 592; *Madril v. Superior Court of Los Angeles County* (1975), 15 Cal. 3d 73, 539 P.2d 33, 123 Cal. Rptr. 465.

The effect of the trial court's order was to reconsider its suppression ruling. No case has been called to our attention holding that to do so constitutes a violation of a defendant's constitutional rights. The divergent treatment other jurisdictions have given to these type of problems convinces us that the power of a trial court to reconsider a suppression ruling against the State is a question governed by State procedure rather than mandated by constitutional law. Accordingly, unless the record showed that in addition to the procedural error of considering the suppression ruling, there had also been prejudicial error in admitting evidence resulting from a search violating the fourth amendment, the procedural error was waived by the failure to raise it below.

■ Thus in admitting the evidence of the cord and microphone after it had been suppressed, the trial court committed an error which, at most, was one of State procedure and was not called to the court's attention at trial. By failing to object to the admission of these items at trial and not raising the issue in his post-trial motion, defendant waived that error. The admission of any other items suppressed was so insignificant, with reference to the proof, as to be harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

For the reasons stated, we affirm the convictions.

Defendant asserts the consecutive sentences for murder to have been impermissible under the terms of section 5—8—4(a) of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—4(a)). That section prohibits "consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective" unless one of the offenses was a Class X or Class 1 felony in which the defendant inflicted severe bodily injury. As murder is given a statutory classification separate and apart from Class X or Class 1, the issue to be addressed is the

question of whether the two murders fall into the "single course of conduct" category.

Here there is no showing as to the time span between the two killings. Even if they occurred close together, however, the consecutive sentence would not necessarily have been prohibited. In *People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848, consecutive sentences were upheld for murders committed by gun shots fired in rapid succession because the evidence showed the one victim was a witness against defendant in an upcoming trial and the other victim was the witness' wife. This court held that since one victim was to be a witness against defendant and the other was merely a spouse, there was a sufficient showing that separate murder intents had been formed to justify imposition of consecutive sentences.

In *People v. Bellamy* (1972), 8 Ill. App. 3d 606, 290 N.E.2d 645, murder and attempted murder convictions were held to be proper subjects for consecutive sentencing because there were separate victims, separate elements, and separate crimes. Similarly, in *People v. Davis* (1974), 20 Ill. App. 3d 948, 314 N.E.2d 723, consecutive sentences for murder and attempted murder were upheld even though a single episode was involved, for the reason that separate victims were involved. In *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 384 N.E.2d 793, defendants were given three consecutive sentences on two counts of murder and one count of attempted murder. The two murdered victims were going to testify against one of the defendant's brothers, and the third was a witness to the murders of the other two. The court rejected defendant's contention that consecutive sentences violated section 5—8—4(a), stating:

> "We do not believe that the single course of conduct rule was adopted to free a defendant from the consequences of a series of crimes, involving separate acts, committed against several individuals. Such rule would encourage multiple homicides since no greater sentence could be imposed for a second or third killing." 67 Ill. App. 3d 638, 647, 384 N.E.2d 793, 800.

■■ We agree with *Lindsay* and hold that where separate victims are harmed by separate criminal acts directed at the victims separately, consecutive sentences are not prohibited by section 5—8—4(a). The imposition of consecutive murder sentences was not error here.

Defendant also contends that the trial court erred in making the sentences for concealment of the homicidal deaths consecutive to those for the murders which caused the respective deaths because the court did so stating that it was required to do so. Section 9—3.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—3.1) provides in subsection (a) for the offense of concealment of a homicidal death and in subsection (b) states in part:

> "* * * If a person convicted under this section is also convicted of

murder or manslaughter, the penalty under this Section shall be imposed separately and in addition to the penalty for murder or manslaughter."

The heart of the issue raised is whether the requirement that the penalty "be imposed separately and in addition to" that for the homicide means that (1) the offense is not merged in the homicide offense and requires a separate sentence, or (2) a sentence consecutive to the homicide sentence must be imposed. To give the words the first construction makes use of the words "in addition to" redundant because the word "separately" is sufficient to indicate that the convictions are not merged. However, section 5—8—4 of the Unified Code of Corrections (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—4) makes comprehensive provision for the imposition of concurrent and consecutive sentences. In subsection (g) it states that a sentence for escape or attempted escape as defined by section 3—6—4 of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1003—6—4) "shall be served consecutive to" the sentence for which the convict was being incarcerated. We conclude that had the legislature wished to mandate consecutive sentences for other offenses, it would have so provided. We thus construe the words "in addition to" as merely emphasizing the intent that the offense of concealing the body be separate from the underlying homicide.

■■ Although the question is a close one, we hold the trial court to have been in error in concluding that it was *required* to impose consecutive sentences for concealing.

The length of each consecutive sentence imposed by the trial court on the concealment charges was 10 years. The offense is classified as a Class 3 felony (Ill. Rev. Stat. 1977, ch. 38, par. 9—3.1(c)) for which a term of imprisonment may not exceed 5 years (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—1(a)(6)), except where factors in aggravation allow for an extended term sentence not to exceed 10 years (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—8—2(a)(5)). The aggravating factors justifying an extended term sentence are listed disjunctively in section 5—5—3.2(b) of the Unified Code of Corrections. (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).) In extending the term here, the trial court relied on section 5—5—3.2(b)(2) which states that an aggravating factor is present:

"When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b).

■■ Simply stated, defendant contends that, as a matter of law, one cannot be found to have been cruel to a corpse. We do not agree that the concealment of a corpse could not be done in a manner to qualify as

"exceptionally brutal or heinous behavior indicative of wanton cruelty." The cruelty could be imposed upon the bereaved by the manner in which the corpse was handled. This would occur if, for instance, the corpse was intentionally dismembered. However, this was not done here. Some dismemberment and decomposition of the bodies no doubt resulted from their being weighted down in the river, but decomposition is inherent in most concealment of corpses, which is an inherently reprehensible and cruel act. We do not interpret the legislative scheme in regard to extended term sentences to intend that an extended term would be available under section 5—5—3.2(b)(2) unless the degree of brutality or heinous behavior was "exceptional." The evidence in this case does not support such a determination here.

We hold the imposition of enhanced sentences for concealing the bodies to have been error. We need not discuss defendant's further contention that the trial court did not give sufficient reasons for its imposition of those sentences.

For the reasons stated, we affirm all convictions appealed and all sentences except those for concealment of a homicide. Those two sentences are reduced to terms of 5 years' imprisonment each with each to be served consecutively as heretofore ordered. The case is remanded to the circuit court of Menard County for issuance of an amended mittimus.

Affirmed in part; certain sentences reduced; cause remanded.

MILLS, P. J., concurs.

Mr. JUSTICE TRAPP, concurring in part and dissenting in part:

I dissent from that portion of the opinion which would reduce the extended terms (Ill. Rev. Stat., 1978 Supp., ch. 38, par. 1005—5—3.2(b)(2)) upon the convictions of concealment of homicidal deaths (Ill. Rev. Stat. 1977, ch. 38, par. 9—3.1(a)).

The imposition of the extended terms is authorized "[b]y exceptionally brutal or heinous behavior indicative of wanton cruelty." The key adjectives are stated in the disjunctive and in the alternative.

This court has affirmed the imposition of an extended term in *People v. Warfel* (1979), 67 Ill. App. 3d 620, 385 N.E.2d 175, and *People v. Jones* (1979), 73 Ill. App. 3d 99, 391 N.E.2d 767. Each case was concerned with the mistreatment of victims who survived and the opinions were written in the context of pain and fear brutally imposed on living persons. There was no occasion to seriously consider the disjunctive alternative found in the word "heinous."

In Webster's Third New International Dictionary, Unabridged 1050

(1971), the word "heinous" is defined as "hatefully or shockingly evil"; "grossly bad" or "enormously and flagrantly criminal." Its meaning so stated would not seem to require pain and suffering of a living individual.

The majority opinion suggests that dismemberment of the bodies might be considered "exceptionally brutal," but that the acts here should not be considered "exceptional." This record does not suggest that the disposal of the bodies was a temporary measure to aid escape. It is reasonable to infer that the defendant hoped, if he did not expect, that the two bodies would be lost forever. The bodies were ultimately mutilated just as effectively as if defendant had used acid, fire, or a hacksaw. Unless one is to accept the reputed methods of gangsters, the conduct is "heinous."

I would affirm the sentence imposed by the trial court.