THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOEY ISBELL, Defendant-Appellant.

Second District   No. 2—86—1197

Opinion filed December 28, 1988.

Will & Briscoe, Ltd., of Waukegan (Robert P. Will, Jr., of counsel), for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, the defendant, Joey Isbell, was found guilty but mentally ill of the offenses of murder, armed violence, and aggravated assault. The trial court imposed a sentence of natural life imprisonment on the defendant for the offense of murder and 364 days on the offense of aggravated assault, to run concurrent with the sentence for murder. Defendant appeals.

On appeal, defendant raises the following issues: whether the insanity defense he raised was proved by a preponderance of the evidence; whether the court erred in refusing to give defendant's self-defense instructions; whether the court erred in refusing to give defendant's voluntary manslaughter instruction; and whether defendant's sentence was improper.

Fahim Ahmad, a 16-year-old black male, was shot and killed by a bullet fired from a .357 Magnum revolver in Shiloh Park in Zion, Illinois, at a carnival for the celebration of the Fourth of July holiday. There is no dispute that defendant fired the fatal shot.

THE INCIDENT

Several witnesses present at the carnival grounds at the time of the shooting described the scene immediately prior to the shooting. Mary Catherine Loder testified that she saw the defendant walk up to a group of black youths and start pushing them around. Defendant had a gun in his hand. The youths started backing away. Defendant put the gun inside his bib overalls, which he wore without a shirt. He then reached for Fahim, who was on a bicycle but who then fell off. Fahim stood up and moved back. Defendant then pulled out the gun and shot Fahim. Defendant then walked away, tossing the gun under the cab of a nearby truck. On cross-examination, the witness did not recall telling the police that after defendant pushed Fahim, the latter pushed the defendant.

Gary Lee Shaff, a carnival worker, testified that just before the

shooting, he saw the defendant and a black youth having a "talk session which seemed like a little conflict." After the shooting, defendant walked around a corner and stood by a ride "like as if he were wondering what was happening to the black youth." He then walked around the corner, and the witness lost sight of him. Shaff summoned a park ranger, who yelled to defendant to halt and get on the ground. The ranger had to yell two or three times before defendant complied.

Kimberly Dill, age 14, testified that a number of young people were sitting on a fence or standing next to it when defendant came by and sat down next to Wayne Patton. She described defendant as wearing bib overalls and having a beard, mustache, and black hair. Defendant just sat there for 15 or 20 minutes. Then he pulled the gun out again and pointed it at Wayne Patton's head, telling him "you are one lucky nigger." Defendant then took the gun away from Wayne's head. Kimberly then saw Fahim and heard him tell the defendant to put the gun away. Defendant knocked Fahim off of his bicycle, and Fahim pushed him back. Defendant then pushed Fahim again and shot him.

Morniki Patrice Howard, age 15, was at the carnival with Kimberly and her cousins. She described the incident between defendant and Wayne Patton. She then saw defendant push Fahim, who almost fell off of his bicycle. Fahim got up and told defendant not to push him again. Defendant told Fahim he had a gun, but Fahim said he didn't care. Defendant pushed Fahim again and then shot him. During the time defendant was sitting on the fence, he just looked around or stared at the ground.

Vincent M. Patton, age 15, testified that he had first noticed the defendant about 20 minutes before the shooting. He noticed the defendant because of the way defendant was looking at people, "eyeing them strangely." Vincent described defendant's eyes as "mean looking like—they were just strange looking." Defendant came over to a group of youngsters and started yelling at them. Defendant then sat down on the railing next to Vincent's younger brother, Wayne. Defendant told Wayne, "You niggers sure are lucky." Wayne talked to him and was asking him why he called them niggers. Defendant then jumped up and said, "I can call you nigger if I want." He then grabbed Wayne, pulled a gun out of his overalls, and pointed it at Wayne, shaking him. Defendant then pushed Wayne out of the way. Defendant then said, "All you niggers get away from here or I'll blow your heads off." Defendant put the gun back in his overalls. When Fahim came riding up on his bicycle, defendant jumped off the railing and pushed him off of the bicycle. Fahim asked defendant why he had

grabbed him since he had not done anything to defendant. Defendant told him to "shut up." Defendant then pulled the gun out of his overalls, announcing to Fahim that he had a gun. Fahim told him that he was not afraid of the gun, and he had not done anything to defendant. Defendant then pushed Fahim. Fahim was bending over to pick up his bicycle when defendant shot him.

Michelle Mendez, a 15-year-old white female, testified that she and two of her white girl friends were talking with two black male youths. Defendant walked over to the girls and asked them if those were their kind of friends. After the girls responded yes, defendant walked off and leaned against a tree. The girls walked over to Fahim and some of his friends to say good-bye. Defendant was leaning up against a tree looking in their direction.

Sylvester Hampton, a Zion police detective, testified that the gun used in the shooting belonged to James Isbell, defendant's father.

Roman Hrynewycz, a park district ranger who apprehended defendant, testified that he had to tell defendant several times to stop and get down on the ground before he responded. As he put defendant in the squad car, he noticed that he had a blank look on his face.

Over defendant's objection, Dale Clark, a Zion auxiliary police officer, testified that defendant told him, "He pulled a knife on me and I had to do it. I wouldn't back down." Clark also overheard defendant's telephone conversation with his father in which he said, "Dad, he pulled a knife on me. I had to do it. I wouldn't back down."

DEFENDANT'S BACKGROUND

Extensive testimony was presented as to defendant's family and social background. That testimony is summarized as follows.

Defendant and his family resided in Zion until his parents were divorced. His father remained in Zion while the rest of the family moved to Mississippi and later to Alabama. While in Alabama, defendant and his younger brother, Tommy, attended school and played with black children without any difficulty. When he was seven, defendant and Tommy returned to Zion to live with their father. In Zion, they played and socialized with black children and their families. Defendant never showed any signs of racial aggression towards blacks.

As a child, defendant was nervous and had problems sleeping. At night, he would wake up screaming and had to sleep with a light on for him.

While living with their father, the boys were often alone and had to fend for themselves. After high school, defendant went into the construction business, building houses and pouring concrete. He was

so employed at the time of the offense.

In November 1979, defendant shot himself with a shotgun and was hospitalized. His father, who was in the hospital at the same time for an unrelated reason, asked him why he shot himself. Defendant responded that he thought his father was going to die, and he thought the two of them could go together.

While defendant was recovering from the gunshot wound, he and some friends went snowmobiling. Defendant was very depressed and was driving excessively. One friend tried to get him to stop, and he would reply "[W]ho cares?" Later, when his snowmobile ran out of gas, he refused to ride on one of the other snowmobiles, arguing that he had nothing to live for. It took 20 minutes in subzero temperatures to convince the defendant to get on another snowmobile. Later at the lodge, defendant stood on a radiator and said he'd kill anyone who tried to move him. Then, he began to laugh as if it were all a joke.

On another occasion, defendant, who had been drinking, complained of chest pains and was driven to the hospital. The hospital refused to treat defendant because he would not sign the consent form. Defendant stated that he did not care and wanted to die anyway.

There was testimony from several witnesses as to defendant's problems sleeping and the nightmares he suffered from and his drinking problem. On one occasion, sitting with his father, working out how much siding he would need to put on one of the houses his father owned, he announced he was going to kill his father and then himself. His father described his expression as "different." Then "his color came back to him," and he went back to discussing the siding.

According to witnesses, defendant would often have a blank or preoccupied look on his face. He would do things and forget that he had done them. He also told people he carried a gun because people were after him.

In 1985, while in Alabama, defendant met and fell in love with a woman named Sheila. Their relationship appeared to turn defendant's lifestyle around. He moved his possessions to Alabama and stayed there several months. When he returned to Illinois for the summer, he had quit drinking and began saving his money, sending money to Alabama for Sheila and her kids, whom he referred to as his kids. He returned to Alabama in September. When he returned to Illinois at Christmas, he had broken up with Sheila because she had returned to her husband. Defendant was drinking heavily. While still in Alabama, defendant took all of the belongings that he and Sheila had purchased together, piled them in the front yard, and burned them. As a result

of this incident, he was arrested and released on bond.

Back in Illinois, defendant continued drinking heavily, which affected his ability to work. He would get upset and throw things around. He became more and more depressed and increased his drinking. After a couple of drinks, all he would talk about was Sheila.

Shortly before the shooting, defendant's brother-in-law passed away in Alabama. Defendant went to Alabama to stay with his sister. He had been very close to his brother-in-law and was very depressed by his death. After the funeral, defendant's sister found a note from the defendant stating that he had fought battles all his life and that he was tired of fighting battles.

On the day of the shooting, defendant went to a tavern called "The Other Place." Although defendant was drinking then, he didn't appear to be under the influence of alcohol. He told the owner about his brother-in-law's death but appeared to be in a good mood. He asked if he could cash a check, and when the owner said yes, he left, presumably to get his checkbook. On the way out, he spoke to another man about getting into the cement finisher's union. Defendant left and didn't return.

A 15-year-old black youth, who witnessed the shooting, described defendant as looking "kind of weird." When asked what he meant by that, he answered, "Well, he had real bushy hair, did not have no shirt on, nothing. He was just looking around like he was crazy or something. He just came among all us black people for some reason and just sat by us."

MEDICAL TESTIMONY

Dr. Pedro Palu-Ay testified that he had been the defendant's family physician since 1974. Defendant had had eight cerebral concussions, seven of which were treated by Dr. Palu-Ay. Most of these concussions resulted from automobile or motorcycle accidents. As a result, defendant suffered from severe headaches and dizziness.

On November 12, 1979, he was hospitalized with a gunshot wound. He had alcohol on his breath at the time, and he had a blood-alcohol level of .259. Surgery was performed to repair various organs and tissues damaged by the gunshot but some pellets remained in his chest area.

On November 26, 1986, defendant was involved in a motorcycle crash. His blood-alcohol level was .359. He was diagnosed as suffering from acute alcoholism and cerebral concussion. During his hospitalization, he complained of noise in the room, and he was moved to another room.

Following the shooting on July 5, 1986, defendant was taken to Victory Memorial Hospital, complaining of nervousness and palpitations. An electrocardiogram was performed, and it was reportedly normal. Blood was drawn but no blood tests were performed.

Dr. Joseph Pribyl testified that he is a clinical psychologist brought in by Dr. Ronald Baron, the defense psychiatrist, to evaluate the defendant. Dr. Pribyl conducted four interviews with the defendant and administered the following tests to the defendant: the Wechsler Adult Intelligent Scale—revised edition, the Bender-Gestalt Visual Motor Test, the Rorschach Inkblot Test, and the Matic Apperception Test. In addition, he reviewed defendant's school and hospital records, police records of the shooting, the commitment of defendant's father to Elgin State Hospital, and his parent's divorce decree. He also received information about defendant from various family members, and an evaluation of the defendant from the Northern Illinois Council on Alcoholism. As a result of their information, Dr. Pribyl diagnosed defendant as suffering from alcohol dependence, alcohol hallucinosis, alcohol anestic disorder, paranoia, and major depression recurrent.

In arriving at the diagnosis of alcohol hallucinosis, Dr. Pribyl relied on information from the defendant that for the last two years, he had been hearing voices. Sometimes these voices talked about things he could understand, and sometimes they were babble or not understandable. Sometimes the defendant heard noises that had practically no meaning. These voices were not heard by others and started out at a time when there was an increase by defendant in his use of alcohol.

In arriving at the diagnosis of alcoholic organic disorder, Dr. Pribyl stated that defendant told him, for example, that he would leave a job-site to go get a tool from his truck which was parked nearby. When he arrived at the truck, he could not remember what tool it was he needed. This happened on more than one occasion, which indicated that he had difficulty with short-term memory. He also had difficulty with long-term memory. For instance, he used to be able to spell very well, and he now has difficulty spelling words with which he had no prior difficulty spelling. The Weschsler test scale also demonstrated signs of organic difficulty.

The diagnosis of paranoia was based upon the defendant's hallucinations. He had delusions that he was being persecuted. These were quite tightly circumscribed. The remainder of his intellectual activity was relatively rational and clear, something that is one of the features of paranoia.

Dr. Pribyl's opinion was that at the time defendant shot Fahim

Ahmad, he was suffering from a mental defect or disorder, and that defendant was not able to appreciate the criminality of his conduct, and he was unable to conform his actions to the requirements of law because of the mental disease outlined above.

Dr. Ronald Baron, a psychiatrist, testified for the defense that he had met with the defendant on three different occasions for a total of 3 hours and 35 minutes. The history he took from the defendant revealed that defendant was a 34-year-old single, white male. He was a carpenter and a concrete contractor who lived with and cared for his disabled father. The history included many of the observations of defendant already set forth in this opinion.

Defendant told Dr. Baron that on the day of the shooting, he was at home looking for his checkbook and saw his father's gun, a .357 Smith & Wesson, sticking out from under the pillow on his father's bed. Although he did not usually carry a gun, he took the gun but did not check to see if it was loaded. He did not know why he took it. He made a telephone call to his girl friend, Mary, but she was not there. He then drove in his van to the park to look for Mary.

As he was going through a crowd of black people at the park, he got shoved and pushed. Defendant did not like to be touched. He had had trouble with black people before. He had been beaten by three blacks in 1978 or 1979, and his bicycle had been stolen by black kids. At the park, there was a black youth on a bicycle. He tried to walk away but the youth pushed him in the back. He did not recall what was said, nor did he recall the youth having a knife. He was more scared than angry. After the shooting, everyone was yelling, and he threw the gun down.

Defendant stated that he had about six glasses of wine on the day of the shooting, which was not unusual for him, but no street drugs or medication. The previous day he had done one or two lines of cocaine. He had had difficulty sleeping the night before the shooting and heard two voices in his head which were carrying on a conversation. He could not make the voices stop, and it scared him. Sometimes there was a third voice that talked about him, sometimes nice, sometimes critically. He thought that for at least six months prior to the shooting, people were watching him. He talked about blacks always bothering him, and he being afraid and angry with them. The youth he shot was a complete stranger to him.

Defendant related that he was anxious, nervous, and depressed. It had been a difficult year for him. He was depressed over his brother-in-law's death. He considered suicide but did not because he had to take care of his father. He had attempted suicide in 1979 with a shotgun.

During the second interview, defendant related that he had suffered from nightmares for a long time. In the nightmares, people killed him, shot him, and cut him up with knives. His father's alcoholism had caused him shame and humiliation as a child. He was very depressed about not being married and having a family. He liked children. He did not know he had shot Fahim, nor did he attempt to hide the gun. He felt confused and uncomfortable carrying the gun, so he put it under something. He did not try to escape from the scene of the crime. Defendant restated that he did not like to be touched. He felt like he was being pushed in the crowd and that people were watching him. Defendant thought that the victim had provoked the attack. Defendant also related incidents of violence by his father against him and his mother and *vice versa*.

During the third interview, defendant discussed again the night before the shooting and his inability to sleep because voices were talking to him.

According to Dr. Baron, defendant has problems with alienation, in that he was thinking thoughts that were not his. Defendant stated that the voices were not present when he took the gun, but they were present in the park and immediately after the shooting. Defendant had a long-standing phobia of closed places and spiders. Since he was a small child, defendant had nightmares about spiders harming him and would wake up thinking that they were in his bed. Defendant had enuresis up to the time he started working for a living. Although his friends and family told him Sheila was not in love with him, he disregarded what they said and, as a result, was extremely hurt by the breakup of the relationship.

Dr. Baron reviewed all of the police reports on the shooting, defendant's hospital records, and Dr. Palu-Ay's records and notes. He interviewed relatives and friends of defendant. He also reviewed the commitment papers for defendant's father to Elgin State Mental Hospital and the report on defendant for the Northern Illinois Council on Alcoholism. He also consulted with Dr. Pribyl relative to his findings.

Dr. Baron diagnosed the defendant as suffering from the following: organic brain syndrome, paranoid schizophrenia, major depression, substance abuse, sleep disturbance, paranoia personality, claustrophobia, and spider phobia, and paranoid erotic syndrome. It was Dr. Baron's opinion, based upon the foregoing data, that when defendant shot Fahim Ahmad, he was suffering from the mental diseases previously set forth, especially organic brain syndrome and paranoid schizophrenia, and that, as a result of these diseases, defendant did not have either the substantial capacity to appreciate the

criminality of his conduct, or the ability to conform his conduct to the requirements of the law. Dr. Baron recommended that the defendant be placed in an institution away from drugs and alcohol and be given sleeping medications or antidepressant medications and vitamins. He would also require drugs to control his psychotic thinking, delusional symptoms and hallucinations. Defendant would need to be institutionalized for a long period of time. According to Dr. Baron, the prognosis for alcohol paranoia is generally poor.

Following Dr. Baron's testimony, the trial court refused to allow defendant to put on testimony as to an incident involving Fahim which would support defendant's theory of self-defense. Pursuant to an offer of proof, Jimmy Blankenship, age 12, testified that on July 21, 1984, Fahim Ahmad, along with another youth, beat up Jimmy, tried to sexually assault him, and stole his bicycle.

In rebuttal, Dr. Henry W. Lahmeyer, the State's psychiatrist, testified that he had interviewed the defendant on two occasions. He also reviewed the police reports describing the events of July 5, 1986, and the reports of Dr. Pribyl, Dr. Baron, and Dr. Neil Allen (the neurologist).

Dr. Lahmeyer disputed the conclusions and diagnosis arrived at by Dr. Baron. Dr. Lahmeyer diagnosed defendant as suffering from major depression and paranoid personality. In his opinion, these diseases did not affect defendant's ability to understand the criminality of his conduct or to conform his conduct to the requirements of the law.

The jury returned a verdict of guilty but mentally ill, and defendant was sentenced to life imprisonment. This appeal followed.

■ Defendant contends, first, that he proved his defense of insanity by the preponderance of the evidence as required by section 6—2(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e)). Defendant has not supported his argument with citation of authority or pages of the record relied on as required by Supreme Court Rule 341(e)(7) (107 Ill. 2d R. 341(e)(7)). The argument is therefor waived. *Flynn v. Vancil* (1968), 41 Ill. 2d 236.

■ Assuming, *arguendo*, we were to consider the issue on the merits, we would resolve the issue against defendant. We note the differing conclusions reached by Dr. Lahmeyer and Dr. Baron. Such conflicts are for the jury to consider, and where the evidence presented by the State, if believed by the jury, was sufficient to establish defendant's sanity beyond a reasonable doubt, then the jury's determination that defendant was sane must be upheld. *People v. Liberg* (1985), 138 Ill. App. 3d 986, 989.

Next, defendant contends that the trial court erred in refusing to

instruct the jury as to the issue of self-defense raised by the defendant.

A defendant has the right to have the jury instructed on his theory of the case and on the law applicable to any statement of facts which the jury might properly find to have been proved. This is so even if the facts upon which the defense is based are contrary to the defendant's own testimony. (*People v. Johnson* (1968), 100 Ill. App. 2d 13, 19.) Very slight evidence on a given theory in a criminal case will justify the giving of an instruction on that theory in a criminal prosecution. *People v. Unger* (1977), 66 Ill. 2d 333, 338.

In *People v. Ross* (1981), 100 Ill. App. 3d 1033, 1038, the court, quoting from *People v. Williams* (1965), 56 Ill. App. 2d 159, 165-66, set forth the elements of self defense as follows:

> "(1) [T]hat force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. There is a further principle involved, when, as in the instant case, the defendant uses deadly force. This principle limits the use of deadly force to those situations in which (a) the threatened use of force will cause death or great bodily harm or (b) the force threatened is a forcible felony. [Citation.]"

In *People v. Munguia* (1975), 33 Ill. App. 3d 880, 883, this court approved an instruction stating " '[a] person is not justified in the use of force if he initially provokes the use of force against himself with the intent to use that force as an excuse to inflict bodily harm upon another person.' " We found the instruction to be entirely reasonable as it properly informed the jury that if it found the defendant was being threatened by the victim just prior to the stabbing, that finding would not excuse the stabbing of the victim, if the jury found that the defendant had provoked such conduct by his reentry into the tavern with a knife. *Munguia*, 33 Ill. App. 3d at 884.

We agree with the State that defendant was not entitled to a self-defense instruction. The testimony elicited by both the State and the defendant shows that it was defendant who initiated the incident by pushing Fahim. Although defendant stated to Officer Clark that he thought Fahim had a knife, none of the other witnesses saw the victim with a knife, nor was a knife found on Fahim after the shooting. Under these facts, there is no evidence from which the jury could con-

clude that defendant was acting in self-defense when he shot Fahim; therefore, the trial court did not err in refusing to instruct the jury on the issue of self-defense.

■ Defendant also argues that the testimony of Jimmy Blankenship, as set forth in the offer of proof, should have been admitted pursuant to *People v. Lynch* (1984), 104 Ill. 2d 194. In *Lynch*, the court held as follows:

> "We hold that *when the theory of self-defense is raised*, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." [Emphasis added.] (104 Ill. 2d at 200.)

In the case at bar, defendant attempted but did not succeed in raising the defense of self-defense, and therefore, even under *Lynch*, we find that Blankenship's testimony was properly excluded.

Next, the defendant contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter based on sudden intense passion.

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) [t]he individual killed ***.
> ***
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2.)

Such conduct includes substantial physical injury, or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse. *People v. Crews* (1967), 38 Ill. 2d 331, 335; *People v. Castiglione* (1986), 150 Ill. App. 3d 459, 468.

■ "The general rule is that in a murder trial, where there is any evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, then it would be error to refuse to give such a tendered instruction. However, it is equally well settled that such an instruction should not be given if the evidence clearly demonstrated that the crime was murder and there is no evidence to support the conviction of manslaughter. [Citation.]" *People v. Jacobs* (1976), 44 Ill. App. 3d 290, 292-93.

■ Prior to the shooting, defendant initiated a shoving match with the victim and pointed a gun at him. These facts clearly do not support the giving of the instruction on voluntary manslaughter under

the above criteria. Further, there is no credible evidence that the victim possessed a knife as defendant asserts. We therefore agree with the State that the trial court did not err in refusing to instruct the jury on voluntary manslaughter.

Finally, defendant contends that the trial court erred in imposing a sentence of natural life imprisonment.

■■ In order to impose a sentence of natural life imprisonment on the defendant in this case, the trial court was required to find that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty or that any of the aggravating factors listed in subsection (b) of section 9—1 of the Criminal Code of 1961 are present. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b); Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(1).) We note that none of the aggravating factors found in section 9—1 are present. Therefore, we must determine whether the trial court erred in determining that the murder of Fahim was accompanied by brutal or heinous behavior on the part of the defendant.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, 501, our supreme court, in rejecting the defendant's claim that a sentence of life imprisonment without parole is authorized only if the defendant inflicted torture or unnecessary pain upon the victim, stated as follows:

> " 'Heinous' is defined by Webster's Third New International Dictionary (unabridged) as 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal': 'brutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' Clearly, in our opinion, the statute does not limit the imposition of a sentence of natural life imprisonment to any of those murders involving torture or the infliction of unnecessary pain."

In *La Pointe*, the defendant, prior to the murder, had told a friend that he was going to shoot a cab driver and showed the friend the gun he was going to use. At the time of the murder, defendant was on probation for burglary and had previously solicited another acquaintance to rob a drug store with him. Defendant used drugs and attempted to have "hash" smuggled into the jail for himself. At his sentencing hearing, defendant claimed that he had been under the influence of drugs at the time of the murder. The supreme court determined that the trial court properly rejected defendant's claims that he had been under the influence of drugs at the time of the murder, and concluded as follows:

> "The record in this case indicates that the defendant, a young man with a significant history of criminal activity, acted

with premeditated, cold-blooded deliberation in deciding to kill a cab driver, a homicide for which the death penalty could have been sought, had the prosecutor elected to do so. Following that murder and while being held in the county jail, he displayed a callous attitude and complete lack of remorse by wearing [a] tee shirt with the words 'Elmhurst Executioner' appearing thereon. We do not believe that the trial judge can be said to have abused his discretion in sentencing defendant to natural life imprisonment without parole." 88 Ill. 2d at 501.

In *People v. Wilson* (1985), 138 Ill. App. 3d 513, this court affirmed the imposition of a natural life sentence upon the defendant despite defendant's history of mental and drug-related problems. In that case, the victims were tied up. Defendant shot at two of the victims but missed. He loaded his gun a third time and shot the third victim twice at close range, killing him.

Both *La Pointe* and *Wilson* are distinguishable from the case at bar. In the case before us, there was no evidence that defendant was carrying out a preconceived plan to murder Fahim. Although Fahim was unarmed, the victim in *Wilson* was not only unarmed but rendered helpless prior to being shot and killed. Moreover, in the present case, the jury found defendant guilty but mentally ill, where in *La Pointe* and *Wilson*, no such findings were made.

Although involving an extended-term sentence rather than a sentence of life imprisonment without parole, we find *People v. Holiday* (1985), 130 Ill. App. 3d 753, to be instructive on this issue. In that case, Holiday and another man, both masked and armed, entered an apartment where a dice game was taking place. Holiday had previously been at the game. Upon entering the apartment, Holiday stated, "Is there any heroes in the house?" and opened fire, killing one man and wounding three others. Holiday was sentenced to an extended-term of 80 years for murder. In vacating and remanding the extended-term sentence for murder, the reviewing court stated:

"We also agree with the defendant that the trial court erred in imposing an extended-term sentence for murder. The trial court apparently relied on Section 5—5—3.2(b)(2) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—5—3.2(b)(2)), which permits imposition of an extended term when a felony is 'accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.' We have construed this statute as not permitting imposition of an extended term except when the degree of brutality or heinousness is exceptional. (*People v. Fieberg* (1982), 108 Ill. App. 3d 665, 439 N.E.2d 543; *People v.*

*Schlemm* (1980), 82 Ill. App. 3d 639, 402 N.E.2d 810, *cert. denied* (1981), 449 U.S. 1127, 67 L. Ed. 2d 115, 101 S. Ct. 948.) In *Fieberg*, we reviewed a number of cases in which extended-term sentences were found to be proper, noting that those cases included such facts as the victim being beaten until unconscious and then being strangled to death, a stranger grabbing a victim on the street and then beating her face on the sidewalk, and a victim's being kidnapped, stripped, beaten, and then being subjected to multiple acts of rape and sexual abuse by three men. More recent cases have involved such acts as causing a six-year old girl to become intoxicated and then sexually attacking her in a manner causing a severe vaginal laceration. (*People v. Strait* (1983), 116 Ill. App. 3d 110, 451 N.E.2d 631), and a stepmother beating her four-year-old son over a period of months, immersing his hands in scalding water and then failing to seek medical attention, resulting in his death. *People v. Cox* (1983), 113 Ill. App. 3d 136, 446 N.E.2d 1280.

In this cause the defendant entered a room where a dice game was being played, brandishing a gun, and then shot the deceased twice in the chest. For these acts he was properly convicted of murder. But we find no acts of exceptional brutality or heinousness in this conduct. \*\*\* Without deprecating the seriousness of the defendant's conduct in this cause, we do not find that his conduct in shooting the deceased constituted such exceptional brutality or heinousness as to permit imposition of an extended-term sentence. Accordingly, his sentence for murder must also be vacated." 130 Ill. App. 3d at 757-58.

Likewise in the case before us, while the circumstances of this case justify the defendant's conviction for murder, they do not reach the exceptional degree of brutality or heinousness required for the imposition of either an extended term or a sentence of life imprisonment without parole. Moreover, while in *Holiday* the court agreed that Holiday was properly found guilty of murder, in the case before us, the jury determined that defendant was guilty of murder but mentally ill, thus recognizing that defendant's conduct was not necessarily the product of rational thought.

We conclude, therefore, that defendant's sentence of life imprisonment without parole must be vacated and the cause remanded for a new sentencing hearing in light of the views expressed in this opinion. Deciding the case as we do, we need not address the other errors in sentencing alleged by the defendant.

Defendant's conviction for murder and aggravated assault are af-

firmed as is the sentence imposed for aggravated assault. Defendant's sentence for murder is vacated and the cause remanded for a new sentencing hearing.

Affirmed in part; vacated in part and remanded.

NASH and DUNN, JJ., concur.