THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CLYDE ROGERS, Defendant-Appellant.

First District (1st Division) No. 82—22

Opinion filed March 5, 1984.—Rehearing denied April 9, 1984.

James J. Doherty, Public Defender, of Chicago (Patricia J. Handlin and Mary T. Woodward, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Richard B. Levy, and Thomas Gearen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGLOON delivered the opinion of the court:

After a jury trial, defendant Clyde Rogers was convicted of murder, burglary and robbery. He was sentenced to concurrent terms of imprisonment of 65 years for murder, seven years for burglary, and seven years for robbery. Defendant appeals.

On appeal, defendant contends (1) the trial court erred in denying

the motion to suppress his confessions; (2) hearsay evidence was improperly admitted; (3) the trial court erred in allowing evidence that one of defendant's confessions was obtained in Pontiac, Illinois; (4) he was not proved guilty beyond a reasonable doubt; (5) his motion for a new trial was improperly denied; and (6) the trial court erred in imposing an extended-term sentence.

We affirm.

The charges against defendant arose from an incident during which Michael Lux was murdered and certain items were taken from Lux' home. Prior to trial, a hearing was held on defendant's motion to suppress. One statement was made on June 16, 1979, three days prior to defendant's indictment. Three other statements were made after defendant's arrest on July 31, 1979.

At the hearing, Detective John Yucaitis testified that on June 16, 1979, he spoke to defendant at Pontiac Correctional Center about the murder of Michael Lux. He and his partner Dennis McGuire met with defendant at 11 a.m. Yucaitis read defendant his rights and defendant stated he understood them. He never threatened defendant or made any promises in exchange for defendant's statement. Yucaitis told defendant that he had talked to Thomas Jones during the investigation and that Jones had been indicted. He also read parts of Jones' statement to defendant. After Yucaitis told defendant facts learned during the investigation of the murder, defendant told of his involvement in the incident. During the interview, defendant asked about the possibility of being a State's witness. Yucaitis told defendant that only the State's Attorney could consider the matter.

Officer Dennis McGuire testified he was with Yucaitis when defendant was interviewed at Pontiac. Yucaitis gave defendant *Miranda* warnings at the beginning of the interview. During the interview, defendant gave a statement regarding the murder of Michael Lux. Defendant was never threatened or promised anything in exchange for his statement.

Detective Peter Dignan testified that on July 31, 1979, he and his partner Robert Dwyer were instructed to bring defendant from the penitentiary at Pontiac to Chicago. When defendant was in their custody, Dignan advised defendant that he had been indicted for the murder of Lux and read defendant his rights. Defendant said he understood his rights. They brought defendant to Chicago and interviewed him at the State's Attorney's office. Prior to the interview, defendant was again advised of his rights. Defendant gave a statement and agreed to have it transcribed. Dignan contacted Assistant State's Attorney Rakoczy. Rakoczy told defendant he had been indicted, told

defendant his rights and interviewed defendant. Before defendant's statement was transcribed, defendant was again advised of his rights. Each time *Miranda* warnings were given defendant said he understood his rights and defendant never attempted to invoke his right to remain silent or his right to counsel. Defendant was never promised leniency in return for his statement or threatened. The testimony of Detective Robert Dwyer corroborated that of Dignan.

Assistant State's Attorney Mark Rakoczy testified that when he met with defendant on July 31, 1979, he told defendant about the indictment and advised defendant of his rights. Defendant said he understood his rights. Rakoczy asked defendant whether he had been threatened or if any promises had been made to him and defendant replied no. Defendant never asked to speak to an attorney. Rakoczy never discussed the possibility of defendant being a State's witness in exchange for his statement.

Defendant testified that on June 16, 1979, he was imprisoned at Pontiac for a parole violation. On that day, he spoke with two Chicago police officers who asked defendant to give a statement about the murder of Michael Lux. Defendant said he wanted his lawyer present, but Yucaitis told him he did not need a lawyer. Yucaitis told him that Jones had been indicted, was in custody, and had given a statement. In his statement, Jones said Willie Henderson had shot the victim. Yucaitis threatened to charge defendant with murder and recommend the death penalty if defendant refused to give a statement. Yucaitis also told defendant he would never be released from prison if he did not cooperate. On July 31, 1979, Dignan and another Chicago police officer took defendant from Pontiac to Chicago. He was never advised of his rights. Defendant requested the presence of his attorney, but Dignan said that was not necessary. Defendant said he would not sign any statements, but Dignan threatened to charge defendant with murder and seek the death penalty. Dignan also said that if defendant cooperated, he would be a State's witness. Later, defendant was questioned by the State's Attorney who failed to advise defendant of his rights. The State's Attorney also threatened to charge defendant with murder if defendant failed to cooperate.

The trial court denied defendant's motion to suppress. Thereafter, the court ordered that defendant and Thomas Jones be tried simultaneously before separate juries. The following evidence was presented at trial.

Peter Lux testified that on June 16, 1978, at about 5:45 p.m., he spoke to his brother Michael Lux (the victim). The following day, he was unable to contact the victim by phone. He became worried and,

at about 2 p.m., went to his brother's home. He discovered the victim's body on the dining room floor. The victim's hands and feet were bound and a belt was fastened around his neck. The house was in disarray. Lux phoned police. He noticed that two televisions and some jewelry were missing from the home and the victim's car was not in the garage.

Officer Dominick Alston and Detective Peter Dignan took part in the investigation at the victim's home on June 17, 1978. They observed the victim's body, bound hand and foot with electrical cord, lying on the dining room floor. A belt was wrapped tightly around his neck. Dignan testified the body was cold and advanced post-mortem lividity was evident in the victim's hands, arms, back and legs. Both witnesses testified that they observed drag marks on the living room and dining room carpeting from the corner where the victim's television set once stood to the kitchen at the rear of the home. The house had been ransacked, but there were no signs of forcible entry. Dignan further testified he examined the garage with Peter Lux and noticed that a pane of glass had been forced from a window. The victim's auto had been stolen.

Mitra Kalelkar performed the autopsy on Michael Lux. External and internal examinations indicated that the cause of death was asphyxiation due to strangulation with the belt.

Joe Tallie testified that on June 16, 1978, he resided across the street from the victim. At about noon, Bruce O'Neal, Tom Jones and Willie Henderson arrived at his home. Henderson said that he, Jones and defendant were going to "rip off the old white man across the street." The next day, he saw police officers at the victim's home. Tallie further testified that he spoke to police about the murder about one year later.

Detective John Yucaitis testified that on June 11, 1979, he and his partner John Ryan went to speak to Joe Tallie. Yucaitis left a business card because Tallie was not home. The following evening Tallie phoned Yucaitis, who then spoke to Tallie at his home. After the conversation, Yucaitis and Ryan arrested Thomas Jones. On June 16, 1979, Yucaitis and Detective McGuire went to Pontiac, Illinois, to interview defendant. They told defendant they wanted to question him about the murder of Michael Lux and advised defendant of his rights. Defendant then stated that on the day of the murder, he, Willie Henderson, Thomas Jones and Joe Tallie were at Tallie's home and planned to "rip off" the old man who lived across the street. Later that evening, defendant, Jones and Henderson went to Lux' back door. When Lux answered, defendant fled because he thought Lux

had a gun. Henderson and Jones hid under the porch. Defendant returned 10 or 15 minutes later and found that Lux was dead. Jones said Henderson killed Lux. The men took two television sets, put them in the victim's car, drove to Jones' home and brought the televisions inside. They abandoned the car in an alley and threw the keys into a vacant lot. The next day, Jones sold the televisions and jewelry and gave defendant $85.

Detective Peter Dignan testified he arrested defendant at Pontiac, Illinois, on July 31, 1979. He drove defendant to the State's Attorney's office at 26th and California in Chicago. In the presence of Dignan and his partner, defendant made a statement concerning the murder of Michael Lux. Defendant was advised of his rights at the time of his arrest and prior to giving his statement.

Dignan testified that defendant gave the following statement. On June 11, 1978, defendant, Jones and Henderson were at Henderson's home. Henderson said he knew an old, rich man in the neighborhood and "he wanted to rip him off." They talked about breaking into the man's house, and Henderson suggested they do it the following day. Jones suggested and they all agreed to break in the evening of the 16th because a band would be playing at the home next door and no one would hear them. When they arrived at Lux' residence that evening, defendant watched the victim through a window near the back door. Henderson made noise and Lux came to the back door. Defendant thought Lux had a gun and ran to the side of the house. When Lux answered the door, Henderson, who had been hiding under the porch with Jones, jumped the victim. Defendant ran from the scene and returned shortly thereafter. When he entered the house, he saw that Lux was dead. Henderson said he had to kill Lux because during a struggle with the victim, Jones called out Henderson's name. Thereafter, the men took two televisions, jewelry and other items from Lux' home and put them in the car in the garage. The next day, they sold the items taken from Lux' home.

Mark Rakoczy testified that he spoke with defendant in the presence of Dignan and Dwyer. He first advised defendant of his rights. Defendant agreed to have his statements transcribed. Defendant read and signed the statement. Rakoczy read defendant's statement in court. Defendant's written statement is virtually identical to the oral statement given to Dignan and does not merit recitation.

■ First, defendant contends the trial court erred in denying his motion to suppress. He maintains the evidence shows his confessions were obtained by coercion and without a knowing waiver of his right to remain silent and his right to counsel.

The critical question in deciding a motion to suppress is whether the confession was voluntary and given without compulsion or inducement which would overcome defendant's will. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508; *People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371.) In deciding this question, the totality of circumstances must be considered (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371; *People v. Mitchell* (1981), 98 Ill. App. 3d 398, 424 N.E.2d 658), and the trial court's decision will not be reversed unless it is against the manifest weight of the evidence. *People v. Dalton* (1982), 91 Ill. 2d 22, 434 N.E.2d 1127; *People v. Dixon* (1982), 105 Ill. App. 3d 340, 434 N.E.2d 369.

■ In this case, there is ample evidence which if believed by the trial court indicates that defendant's statements were voluntary. The facts show thav defendant was fully advised of his rights prior to each interrogation and no force, coercion, threats or promises were used to induce the confessions. The fact that defendant's testimony contradicts that of the State's witnesses is not a basis for reversal. Contradictions in the evidence are best resolved by the trial court, whose duty is to decide the credibility of witnesses and the weight to be accorded their testimony. (*People v. Dixon* (1982), 105 Ill. App. 3d 340, 434 N.E.2d 369; *People v. Lester* (1981), 102 Ill. App. 3d 761, 430 N.E.2d 358.) In view of the evidence, we find the trial court's denial of defendant's motion to suppress is not against the manifest weight of the evidence.

■ Second, defendant contends the testimony of Joe Tallie was inadmissible where the State failed to offer independent evidence of a conspiracy.

Under the co-conspirator's declaration exception to the hearsay rule, declarations of one co-conspirator are admissible against another. (*People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968.) A conspiracy need not be charged, but a *prima facie* case of conspiracy must be established and it must be shown that the statements were made during the course and in furtherance of the conspiracy. *Olmos; People v. Meagher* (1979), 70 Ill. App. 3d 597, 388 N.E.2d 801.

■ A person commits conspiracy when, with the intent that an offense be committed, he agrees with another to commit that offense. (Ill. Rev. Stat. 1981, ch. 38, par. 8—2.) Here, the State presented independent evidence of a conspiracy. Defendant's statements to Yucaitis, Dignan, and Assistant State's Attorney Rakoczy evidence the agreement and intent to commit an offense. The statements to Tallie were made on the day the incident occurred. Additionally, the trial court could have reasonably concluded that the statements made

to Tallie were a request for his assistance or a warning not to interfere. Such statements are clearly in furtherance of the conspiracy. We therefore find no error in the admission of Tallie's testimony.

■ Defendant's third contention is that the trial court erred in allowing Yucaitis and Dignan to testify that defendant was questioned and arrested at Pontiac, Illinois. He argues he was prejudiced by the references to the city because trials stemming from riots at the correctional facility there were being publicized at the time of his trial. Thus, the jury could have concluded that defendant had been imprisoned for other charges prior to his arrest.

In ruling on defendant's motion to prohibit the introduction of this evidence, the trial court prohibited the State from referring to or inferring that defendant was in a correctional facility. Only the city of Pontiac was mentioned during the trial testimony of Yucaitis and Dignan. The jury was never informed of defendant's incarceration and the State never attempted to infer this fact at any time during the trial. Therefore, we find no error in the admission of this evidence.

■ Fourth, defendant contends he was not proved guilty of murder, robbery and burglary beyond a reasonable doubt either as a principal or by accountability. Even accepting defendant's version that he fled before his companions entered the home, we nonetheless find that defendant was proved guilty under an accountability theory.

Where a defendant has solicited, aided, abetted or agreed or attempted to aid another in the planning or commission of an offense with the intent to promote or facilitate the commission of the offense, he is legally accountable for the conduct of another. (Ill. Rev. Stat. 1981, ch. 38, par. 5—2(c).) Whatever is done in furtherance of the design is the act of all, and each is guilty of the crimes that are committed. *People v. Muellner* (1979), 70 Ill. App. 3d 671, 388 N.E.2d 851.

■ ■ Defendant's statements and confessions evidence an agreement to commit burglary. In these, defendant stated he and the other men planned to break in later that evening and "rip off" the victim. Defendant also assisted in removing property from the home and transporting it to Jones' home. Defendant received money from the sale of stolen goods. The evidence was sufficient to prove defendant guilty of burglary. Defendant's robbery and murder convictions should also stand. Even if defendant was not present at the time the victim was threatened and murdered, his knowledge and planning of the criminal scheme and subsequent participation and execution are sufficient to hold him accountable. *People v. Kessler* (1974), 57 Ill. 2d 493, 315 N.E.2d 29; *In re M.H.* (1980), 85 Ill. App. 3d 385, 406 N.E.2d 873.

■ Fifth, defendant contends the trial court erred in denying his motion for a new trial where the State withheld evidence requested during discovery which was material to the issue of guilt. The alleged discovery violation arose from the State's failure to inform defendant that Bruce O'Neal was a party to the conversation with Tallie and that Tallie had testified against O'Neal in criminal intimidation proceedings. However, we find that the denial of the post-trial motion was proper. Upon learning of an alleged nondisclosure, a defendant must take affirmative action by seeking a continuance or requesting appropriate sanctions and cannot wait until after trial and verdict to complain. (*People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235.) Defendant learned of the evidence during trial, failed to take any action then, and thus waived his objections to the nondisclosure.

■ ■ Finally, defendant contends the trial court committed reversible error in imposing an extended-term sentence of 65 years for murder where there was no proof of exceptionally brutal or heinous behavior and where he was convicted only as an accomplice who did not actively participate in the offense.

The fact that defendant was convicted as an accomplice does not affect the application of the extended-term statute (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—2). As noted in *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150, the imposition of an extended-term sentence is determined by the offense, not the nature and degree of defendant's participation. Furthermore, unnecessary additional physical intrusions, such as binding or terrorizing victims, are proper factors upon which to base an extended term. (*People v. Viens* (1982), 109 Ill. App. 3d 1017, 441 N.E.2d 660.) In imposing the sentence, the trial court cited the fact that the victim was bound and found that the crime was accompanied by particularly brutal behavior. Considering these factors and giving the proper deference and weight to the sentencing decision (*People v. Butler* (1976), 64 Ill. 2d 485, 356 N.E.2d 330), we find defendant's contention to be without merit.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY, P.J., and CAMPBELL, J., concur.