THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHARLES A. RATZKE, Defendant-Appellant.

Second District   No. 2—91—1440

Opinion filed December 21, 1993.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a jury trial in the circuit court of Lake County, defendant, Charles Ratzke, was convicted of first degree murder in connection with the death of Robert Snook. The trial court sentenced defendant to a term of natural-life imprisonment, finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty and that the aggravating factor set forth in section 9—1(b)(6) of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6) (now 720 ILCS 5/9—1(b)(6) (West 1992))) was present.

On appeal, defendant challenges his sentence, raising the following issues: (1) whether the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" is unconstitutionally vague in violation of the eighth amendment; (2) whether the trial court was precluded from imposing a natural-life sentence based on the existence of the aggravating factor set forth in section 9—1(b)(6) of the Criminal Code when the jury did not find defendant eligible for the death penalty based on that aggravating factor; (3) whether an offender convicted under a common-design theory of accountability may receive a natural-life sentence based on exceptionally brutal or heinous behavior indicative of wanton cruelty; (4) whether the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty; and (5) whether, in finding exceptionally brutal or heinous behavior, the trial court disregarded evidence of the

defendant's remorse and emotional condition and was unduly influenced by victim impact statements.

We affirm. As set forth below, we find that the sentence may be sustained on the basis of the trial court's finding that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. It is therefore unnecessary to consider defendant's argument pertaining to the propriety of a natural-life sentence based on the existence of an aggravating factor under section 9—1(b) of the Criminal Code.

On April 27, 1991, defendant and his friend, George Goodman, abducted Robert Snook at gunpoint, while Mr. Snook was at a car wash washing his black 1984 Porsche 928. Mr. Snook was forced into his car and was driven to a location on Rollins Road, where, after stepping out of the vehicle, he was shot. Although wounded, Mr. Snook began to run, at which point he was struck by his car. While lying in the road, Mr. Snook was accidentally hit by another vehicle. Mr. Snook later died from his injuries.

Leslie Vice was the driver of the car which accidentally hit Mr. Snook. Along with her husband, Mark Vice, and several family members, Ms. Vice was driving westbound on Rollins Road on April 27. Before colliding with Mr. Snook she observed an eastbound car approaching at a high rate of speed. Ms. Vice was unable to describe the car, but Mark Vice indicated that it was a sports car resembling a Datsun Z-28. The car was partially in Ms. Vice's lane, forcing her to slow down and pull over onto the shoulder. After the car had passed, Ms. Vice saw what appeared to be a man lying in the road. Although she braked and swerved, she was unable to avoid hitting the man. Mr. Vice got out of the car and observed Mr. Snook to be alive and in great pain.

Vincent Pacello was driving eastbound on Rollins Road on the evening of April 27, when he observed that a car was stopped in the westbound lane and two people appeared to standing over an individual who was lying in the road. Continuing eastbound, Mr. Pacello observed a dark Porsche ahead of him travelling at a low rate of speed. The Porsche stopped at a traffic signal at the intersection of Rollins Road and Route 45, and Mr. Pacello stopped behind it. There was a vehicle ahead of the Porsche also stopped at the traffic signal. Mr. Pacello observed two individuals in the Porsche, the larger of whom was driving. It was established at trial that defendant was approximately 6 feet to 6 feet 2 inches and weighed between 200 and 240 pounds, while George Goodman was approximately 5 feet 10 inches and weighed between 140 and 150 pounds. Mr. Pacello testified that the

two individuals in the Porsche appeared to be arguing. Mr. Pacello noted that he was unable to see through the windshield of the Porsche to the road up ahead. He also observed that it appeared that one of the brake lights on the Porsche was not illuminated. Mr. Pacello viewed a photograph of the rear of Mr. Snook's Porsche and indicated that the lighting configuration, which included the presence of a European fog lamp—a single red lamp at the left of the license plate—was present on the Porsche he observed on April 27.

The three cars stopped at the intersection all turned right onto Route 45. Mr. Pacello continued behind the Porsche as it travelled south. As they approached the intersection of Route 45 and Knowles Road, the driver of the Porsche first signalled a right turn, but abruptly activated the left directional signal and turned left onto Knowles Road. Mr. Snook's Porsche was discovered the next day off to the side of Knowles Road at a location east of Route 45.

Defendant was arrested on April 30, 1991, after his girlfriend, Tammy Andrews, contacted the Crimestoppers organization and indicated that defendant had admitted his involvement in the abduction of Mr. Snook. After his arrest, defendant made a statement, which was tape-recorded, to detectives with the Lake County sheriff's department, admitting that he and his friend, George Goodman, had abducted Mr. Snook. Defendant claimed, however, that it was Goodman who shot Mr. Snook, at which point defendant fled from the car. Goodman then struck Mr. Snook with the stolen car as Mr. Snook stood in the road.

According to defendant's statement, he and Goodman had spent some part of the day of April 27 looking for defendant's girlfriend, who he suspected was cheating on him. Defendant was frustrated in his efforts because his mother would not let him use her car. When defendant and Goodman observed Mr. Snook washing his car, Goodman suggested they take the car, saying "it would be easy." After further conversation, and after defendant telephoned his mother, but was again denied permission to use her car, defendant agreed to Goodman's suggestion. Goodman held a .380 caliber semiautomatic handgun as they approached Mr. Snook. Defendant admitted that he had been in possession of a .22 caliber semiautomatic handgun, but he told police he had given it to Goodman earlier in the day.

Defendant and Goodman forced Mr. Snook into his car at gunpoint. Defendant drove the car while Goodman held the gun on Mr. Snook. While driving westbound on Rollins Road, as they were crossing a bridge, Goodman told defendant to pull over to the side of the road. Defendant told Mr. Snook not to worry because if he walked for

a mile or two, he could get to a telephone. Mr. Snook responded that he knew someone who lived on Drury Lane. At trial, it was established that Mr. Snook did have a friend who lived on Drury Lane. As Mr. Snook was exiting the vehicle, a shot was fired at which point, defendant said "f--- this," jumped out the car, and began running. Mr. Snook was also running eastbound along Rollins Road. Goodman yelled to defendant, pointed the gun at him and threatened to kill him if he told anyone about the incident. Defendant then ran into the woods. By this point, Goodman was driving Mr. Snook's car eastbound. Defendant observed the car strike Mr. Snook, who was standing in the road. Mr. Snook was thrown over the vehicle after hitting the windshield. Goodman stopped the car and told defendant to get in. Defendant refused and ran south through a field. While running, defendant heard a screeching sound, at which point he turned and saw a westbound vehicle strike Mr. Snook.

Later that evening, defendant sold the .22 caliber handgun to David Mateja, whom he encountered at a bar called Sherri's R. & R. Crossing. Mateja, in turn, gave the weapon to a friend of his in settlement of a debt, but Mateja retrieved the weapon and turned it in to the Lake County sheriff's department. According to defendant's statement to the detectives, when he returned to his girlfriend's apartment some time after fleeing from the scene of the shooting, he encountered Goodman, who instructed him to return the .22 caliber weapon to him and instructed him to sell it to Mateja. A .22 caliber shell casing recovered at the scene of the shooting on Rollins Road was examined at the Northern Illinois Police Crime Laboratory. Although it could not be established with certainty that the shell casing was fired from defendant's .22 caliber handgun, the condition of the shell casing was consistent with it having been fired from that weapon. A live round of .22 caliber ammunition capable of being fired from defendant's weapon was discovered at the car wash from which Mr. Snook was abducted. It was established that if the slide on defendant's handgun was pulled back while a live round of ammunition was in the chamber, the live round would be ejected from the gun.

Mr. Snook's car was found on the morning of April 28, 1991, off to the side of Knowles Road, at a location east of Route 45. The windshield was shattered, and the window on the passenger side was broken out, with only shards of glass remaining at the bottom. A .380 caliber shell casing was discovered in the backseat. Additionally, a .380 caliber bullet was recovered at the scene of the shooting on Rollins Road. Human blood was present on the .380 caliber bullet and

particles of a substance that resembled glass were embedded in the bullet. It was established that the .380 caliber bullet and shell casing had been fired from a semiautomatic handgun found at the premises where George Goodman was arrested.

Defendant testified on his own behalf at trial. His account of the events of April 27, 1991, was substantially in conformity to his statements to police following his arrest.

Based on this evidence, the jury found defendant guilty of murder. Thereafter, the first stage of a bifurcated death penalty hearing was held to determine whether defendant was eligible for the death penalty on the basis of the aggravating factor set forth in section 9—1(b)(6) of the Criminal Code (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(6) (now 720 ILCS 5/9—1(b)(6) (West 1992))) (during course of specified felony, with requisite intent, defendant personally inflicted injuries substantially contemporaneously with injuries inflicted by person(s) for whose conduct defendant is legally accountable, and death resulted from injuries inflicted by defendant or such other persons). Defendant's evidence included, *inter alia*, a videotape of an interview of defendant conducted at the Lake County jail on May 2, 1991, by Felipe Ponce, a reporter for WBBM television news in Chicago. At the jury's request, the trial testimony of Vincent Pacello and Mark and Leslie Vice was read by the court reporter. Following its deliberations, the jury did not find defendant eligible for the death penalty. Thereafter, the trial court sentenced defendant to a natural-life term of imprisonment, finding that the aggravating factor set forth in section 9—1(b)(6) was present and that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. This appeal followed.

Defendant first challenges the constitutionality of section 5—8—1 of the Unified Code of Corrections, which provides, in pertinent part, that a trial court may sentence a defendant convicted of first degree murder to a term of natural-life imprisonment if the court finds that the murder was "accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b) (now codified, as amended, at 730 ILCS 5/5—8—1(a)(1)(b) (West 1992)).) Citing *Maynard v. Cartwright* (1988), 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853, defendant contends that the phrase "exceptionally brutal or heinous behavior indicative of wanton cruelty" is unconstitutionally vague.

■ Courts in this State have repeatedly rejected similar challenges. The same language appears in the death penalty statute pursuant to which it is an aggravating factor that "the murdered individ-

ual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(7) (now 720 ILCS 5/9—1(b)(7) (West 1992)).) In *People v. Odle* (1988), 128 Ill. 2d 111, our supreme court determined that this language did not suffer from the same constitutional infirmity identified in *Maynard*. (128 Ill. 2d at 140.) The court reaffirmed that decision in *People v. Johnson* (1993), 154 Ill. 2d 356, 372-73. In *People v. Brown* (1990), 195 Ill. App. 3d 78, 91, we concluded, based on *Odle*, that the same language, as it appears in the extended-term statute (Ill. Rev. Stat. 1989, ch. 38, par. 1005—5—3.2(b)(2) (now 730 ILCS 5/5—5—3.2(b)(2) (West 1992))), does not violate the principles of *Maynard* even though no limitation based on the age of the victim applies for purposes of imposition of an extended-term sentence. In *Brown*, we also concluded that in noncapital cases an eighth amendment vagueness analysis is not applicable to the extended-term statute where the defendant has not claimed that a term-of-years sentence of imprisonment is disproportionate to his offense. (*Brown*, 195 Ill. App. 3d at 88; see also *People v. Hernandez* (1990) 204 Ill. App. 3d 732, 743-44.) *People v. Barnhill* (1989), 188 Ill. App. 3d 299, reached a similar conclusion with respect to the imposition of a natural-life term of imprisonment. In accordance with these decisions, we find defendant's position to be without merit.

■ Before proceeding, we note that the State has correctly observed that the remaining issues raised by defendant are waived because he failed to file a post-sentencing motion at the trial level. (See *People v. Pasch* (1992), 152 Ill. 2d 133, 216; *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 527.) However, we may disregard the waiver rule and consider plain error or defects affecting substantial rights. (134 Ill. 2d R. 615(a).) If erroneous, the imposition of a natural-life sentence might constitute plain error. (*Cf. Lindsay*, 247 Ill. App. 3d at 527 (extended-term sentence reviewed under plain error rule).) In view of this possibility, we deem it advisable and in the interests of justice to consider the merits of defendant's arguments.

We next consider defendant's argument that, because he was convicted based on a "common-design" theory of accountability, the trial court erred in imposing a sentence of natural life based on a finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

Section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c) (now 720 ILCS 5/5—2(c) (West 1992))) provides:

"A person is legally accountable for the conduct of another when:

* * *

(c) Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense."

Our supreme court has construed section 5—2 as incorporating the "common-design" rule, which provides, "where two or more persons engage in a common criminal design or agreement, any acts in furtherance thereof committed by one party are considered to be the acts of all parties to the common design and all are equally responsible for the consequences of such further acts." (*People v. Terry* (1984), 99 Ill. 2d 508, 514; *People v. Kessler* (1974), 57 Ill. 2d 493, 496-97; *People v. Hoard* (1993), 249 Ill. App. 3d 21; *People v. Lee* (1993), 247 Ill. App. 3d 505, 509; *People v. Moreno* (1992), 238 Ill. App. 3d 626, 636.) Under the common-design rule, a defendant can be held accountable for murder even without a showing of an intent to kill. *Hoard*, 249 Ill. App. 3d at 30; *Moreno*, 238 Ill. App. 3d at 636.

Moreover, Illinois courts have long held that a defendant convicted of first degree murder based on a theory of accountability may receive a natural-life sentence (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(1)(b) (now 730 ILCS 5/5—8—1(a)(1)(b) (West 1992))) or an extended-term sentence (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2 (now 730 ILCS 5/5—8—2 (West 1992))) where the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. (See, *e.g., People v. Gant* (1992), 233 Ill. App. 3d 936, 947; *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140, 153.) This is so because "it is the nature of the act and not the identity of the actor that permits the sentence." *People v. Sims* (1993), 244 Ill. App. 3d 966, 1010.) Eligibility for a natural-life or extended-term sentence is "determined by the offense, not the nature and degree of defendant's participation." *People v. Rogers* (1984), 122 Ill. App. 3d 384, 393.

Defendant acknowledges the case law allowing the imposition of a natural-life or extended-term sentence, based on exceptionally brutal or heinous behavior, for an offender convicted under an accountability theory. Defendant argues, however, that in view of our supreme court's decision in *People v. Palmer* (1992), 148 Ill. 2d 70, this principle must be limited to defendants convicted under an accountability theory who intended to promote or facilitate the murder. According to defendant, those whose guilt rests solely upon a common-design theory cannot be said to have possessed the requisite mental state for an enhanced penalty.

Defendant premises this argument on the assumption that the jury accepted his account of the offense at face value. However, Vincent Pacello observed a Porsche similar to Mr. Snook's, following a route consistent with where Mr. Snook's car was later discovered. The fact that Mr. Pacello was unable to see through the windshield of the Porsche appears to be consistent with the shattered condition of the windshield resulting from the collision with Mr. Snook. Two individuals occupied the car, the larger of whom was driving. Defendant is taller than Goodman and was substantially heavier than Goodman at the time of the offense. The trial court credited Mr. Pacello's testimony rather than defendant's self-serving account that he fled when the first shot was fired. Moreover, as there was evidence that defendant's gun was fired on Rollins Road, the trial court was entitled to reject defendant's account, in accordance with which Goodman fired both his own .380 caliber handgun and defendant's .22 caliber handgun and then returned the .22 caliber weapon to defendant and instructed him to sell it, while neglecting to dispose of his own weapon. However, even if we shared defendant's belief that his conviction must be viewed as resting solely on a common-design theory, we disagree with defendant as to the significance of *Palmer* to the case at bar.

At issue in *Palmer* was whether the maximum term of commitment for a defendant charged with murder, but acquitted after successfully asserting the insanity defense, could be based on the extended-term provisions applicable to the charged offense. Section 5—2—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1989, ch. 38, par. 1005—2—4(b) (now 730 ILCS 5/5—2—4(b) (West 1992))) provides that the term of commitment for an insanity acquittee found to be subject to involuntary admission or in need of mental health services on an inpatient basis "shall not exceed the maximum length of time that the defendant would have been required to serve, less credit for good behavior, before becoming eligible for release had he been convicted of and received the maximum sentence for the most serious crime for which he has been acquitted by reason of insanity." The court held that for purposes of this provision the maximum sentence did not include an extended-term sentence based on exceptionally brutal or heinous behavior indicative of wanton cruelty. The court reasoned that "[t]he successful assertion of the insanity defense precludes a finding that the insanity acquittee was conscious of his conduct such that the requisite finding that the insanity acquittee's offense was indicative of wanton cruelty could be made." *Palmer*, 148 Ill. 2d at 88.

*Palmer* did not itself involve the question of an extended-term sentence for a defendant convicted under the theory of accountability. However, the court considered cases on the subject, since some appellate court decisions had purported to rely on accountability cases in holding that the maximum term of commitment for an insanity acquittee could be similarly "enhanced," irrespective of his actual state of mind. Defendant maintains that, in accordance with the *Palmer* court's interpretation of the accountability cases, a defendant convicted under the common-design rule does not possess the requisite mental state for the imposition of an extended-term sentence based on exceptionally brutal or heinous behavior indicative of wanton cruelty.

The *Palmer* court noted that in *People v. Larson* (1985), 132 Ill. App. 3d 594, the appellate court had observed that "[a]pplication of the extended-term statute is determined by the 'offense' rather than by the extent or nature of the defendant's participation." (*Palmer*, 148 Ill. 2d at 89.) *Larson* cited *People v. Gray* (1980), 87 Ill. App. 3d 142, for this proposition. The *Palmer* court observed that the "language in *Gray*, cited in *Larson*, has been interpreted by *Larson*'s progeny as authority for a trial court to completely disregard the state of mind of an insanity acquittee when determining the maximum period of commitment." (*Palmer*, 148 Ill. 2d at 90.) The court commented:

> "The mental state of a defendant convicted of a criminal offense under the theory of accountability was not made irrelevant by *Gray* for purposes of determining whether the offense was exceptionally brutal or heinous behavior indicative of wanton cruelty. *** One cannot be found guilty of an offense under an accountability theory unless that person has the *intent* to promote or facilitate the commission of the offense. It is in this context that application of the extended-term statute 'is determined by the "offense" rather than by the extent or nature of the offender's participation.' " (Emphasis in original.) 148 Ill. 2d at 91-92, quoting *Gray*, 87 Ill. App. 3d at 153.

Defendant suggests that this general formulation of the theory of accountability does not comport with the "common-design" rule since the court refers to intent to promote or facilitate the commission of "the" offense rather than "an" offense. (See *People v. Moreno* (1992), 238 Ill. App. 3d 626, 631-32; see also Illinois Pattern Jury Instructions, Criminal, No. 5.03, Committee Notes (2d ed. Supp. 1989).) Defendant apparently views this passage to mean that an accused convicted under an accountability theory may receive an enhanced

penalty based on exceptionally brutal or heinous conduct only where he intended to promote or facilitate the specific offense for which he is sentenced.

We disagree. We do not view this language as a deliberate effort to differentiate among theories or "degrees" of accountability for sentencing purposes. Instead, with this passage the court merely intended to emphasize that a defendant convicted under an accountability theory possesses a criminal state of mind that is absent in the case of an insanity acquittee. The essential distinction between *Palmer* and accountability cases is that where a defendant acting alone successfully asserts the insanity defense, *no* participant in the illegal acts possesses a mental state consistent with the requirement of "wanton cruelty." However, such a mental state may, in essence, be imputed to a defendant convicted under an accountability theory where the behavior of a codefendant was exceptionally brutal and heinous. To do so does not violate the principles of *Palmer*.

We note that in its discussion of various accountability decisions the *Palmer* court mentioned *People v. Clay* (1984), 124 Ill. App. 3d 140, and four decisions cited in *Clay*: *People v. Rogers* (1984), 122 Ill. App. 3d 384; *People v. Rowe* (1983), 115 Ill. App. 3d 322, *aff'd sub nom. People v. Jordan* (1984), 103 Ill. 2d 192; *People v. Tibbs* (1981), 103 Ill. App. 3d 73; and *People v. Gray* (1980), 87 Ill. App. 3d 142. In three of those cases, it would appear that the defendants were convicted pursuant to the common-design rule. (See *Clay*, 124 Ill. App. 3d 140 (defendant planned robbery of apartment in building where he resided, but was not present during robbery in which an occupant of the apartment was fatally shot, and facts as recited in the text of the opinion do not suggest that shooting was planned); *Rogers*, 122 Ill. App. 3d 384 (defendant properly convicted of robbery and murder where evidence was sufficient to support conviction of burglary; even if defendant was not present at time victim was threatened and murdered, his knowledge and planning of the criminal scheme and subsequent participation and execution were sufficient to establish accountability pursuant to common-design rule); *Tibbs*, 103 Ill. App. 3d 73 (defendant who agreed to steal a van was properly convicted of murder of van's owner).) The *Palmer* court gave no indication that these cases were wrongly decided.

Prior to *Palmer*, in *People v. Jordan* (1984), 103 Ill. 2d 192, our supreme court held that a defendant convicted under an accountability theory may receive an extended-term sentence. The reasoning underlying that decision supports our conclusion that the principle is equally applicable in common-design cases and cases where the

defendant intended to promote or facilitate the specific offense for which he is being sentenced. In *Jordan*, the defendant was convicted of the murder of a grocery store owner during a robbery of the store. The defendant did not carry a weapon, and his participation in the robbery was limited to restraining an employee. However, a codefendant, Ferrel Cunningham, was armed, and after taking money from the cash register, he fatally shot the store's owner without provocation. (103 Ill. 2d at 202-03.) The defendant did not challenge the trial court's determination that the offense was brutal and heinous, but he emphasized that he was not the "triggerman" and therefore *his* conduct was not brutal or heinous. Our supreme court rejected this argument:

> "A similar issue was considered by the court in *People v. Sangster* (1982), 91 Ill. 2d 260. There, it was held that the enhanced penalty of consecutive sentences could be imposed upon a defendant found guilty under a theory of accountability. (91 Ill. 2d 260, 265-66.) The court, citing *People v. Kessler* (1974), 57 Ill. 2d 493, reasoned that the accountability statute ' "*** means that where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act." ' (*People v. Sangster* (1982), 91 Ill. 2d 260, 265, quoting *People v. Kessler* (1974), 57 Ill. 2d 493, 497.) The court then noted that the legislature was presumed to know that the accountability statute had been so interpreted and '[h]ad the General Assembly intended that the consecutive sentencing provisions be inapplicable to a defendant found guilty under [that statute] it would have been a simple matter to provide for an exception as it did in section 9—1(b)(6)(a) of the Criminal Code of 1961.' (*People v. Sangster* (1982), 91 Ill. 2d 260, 265-66.) We note that section 9—1(b)(6)(a) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(a)) provides specifically that the victim be actually killed by the defendant and not by any other party to the crime.
>
> However, the legislature did not provide in section 5—5—3.2(b)(2) that the defendant himself commit the brutal or heinous acts. We therefore conclude that the enhanced penalty of an extended-term sentence may be imposed upon a defendant found guilty upon an accountability theory." *Jordan*, 103 Ill. 2d at 214-15.

The case at bar resembles *People v. Tibbs* (1981), 103 Ill. App. 3d 73, where the defendant was sentenced to an extended term for attempted murder. In *Tibbs*, the victim testified that he was forced into his van by two individuals, Smith and Hardy, who then drove off in the van. Smith and Hardy were later joined by a third individual. The victim was ordered to lie facedown on the ground and was shot with a shotgun. He did not see who shot him. The defendant initially admitted to police that he was the third individual who joined Smith and Hardy and that the three of them had earlier agreed to steal a vehicle. The defendant also told police that Smith fired the shotgun at the victim. At trial, the defendant recanted these statements and presented an alibi defense. The court affirmed the defendant's conviction on the basis of the common-design rule as set forth in *Kessler*. The defendant also challenged the imposition of an extended-term sentence, arguing that the accountability provisions of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, pars. 5—1, 5—2 (now 720 ILCS 5/ 5—1, 5—2 (West 1992))) only make a defendant responsible for conduct which is an element of the offense. The court disagreed, holding that the accountability provisions embrace conduct that, while not an element of the offense, permits an enhanced penalty. *Tibbs*, 103 Ill. App. 3d at 77-78. See also *People v. Hines* (1988), 165 Ill. App. 3d 289, 304.

We agree with the analysis in *Tibbs* and believe its vitality was unaffected by *Palmer*. The statutory accountability provisions, which incorporate the common-design rule (*People v. Kessler* (1974), 57 Ill. 2d 493), make a defendant criminally responsible for a wide range of consequences of criminal acts. There is no sound reason to differentiate exceptionally brutal or heinous conduct from other conduct for which a participant in a criminal endeavor may be held responsible.

Defendant next contends that even if he could be held responsible for Goodman's conduct for purposes of the imposition of a natural-life sentence, the trial court nonetheless committed error because the offense was not accompanied by exceptionally brutal or heinous behavior. We find this argument to be without merit.

Our supreme court has held that "[h]einous" means " 'hatefully or shockingly evil: grossly bad: enormously and flagrantly criminal.' " (*People v. La Pointe* (1981), 88 Ill. 2d 482, 501, quoting Webster's Third New International Dictionary 1050 (1986).) " '[B]rutal' includes 'grossly ruthless,' 'devoid of mercy or compassion: cruel and cold-blooded.' " (*La Pointe*, 88 Ill. 2d at 501.) *La Pointe* held that the use of these terms in section 5—8—1 of the Unified Code of Corrections did not limit the imposition of a natural-life sentence to only those

murders involving torture or the infliction of unnecessary pain. (88 Ill. 2d at 501.) However, for an enhanced sentence, the statute requires that the murder be "exceptionally" brutal or heinous. Thus, "[i]n determining whether conduct is exceptionally brutal or heinous, the court may not consider those acts which simply exemplify, without more, the legal elements of the offense for which the defendant was convicted and instead must look for additional aggravating factors." *People v. Hartzol* (1991), 222 Ill. App. 3d 631, 652.

Generally speaking, in cases where sentences based on exceptionally brutal or heinous behavior have been reversed, the offenders' conduct during the commission of the offense constituted little more than what was implicit in the statutory definition of the offense. (See, *e.g., People v. Gonzalez* (1992), 231 Ill. App. 3d 1071, 1078-79 (where defendant was convicted of attempted first degree murder after firing single shot at victim, trial court which found brutal and heinous conduct to be "the close proximity in which the defendant shot the victim, leaving him paralyzed for the rest of his life," did not articulate appropriate reasons to support imposition of an extended-term sentence); *People v. Fields* (1990), 198 Ill. App. 3d 438 (while burglarizing victim's house, defendant shot victim once and fled after the victim, who was herself armed with a handgun, returned unexpectedly and confronted defendant); *People v. Anderson* (1990), 201 Ill. App. 3d 75, 81 (when victim pushed defendant away after he tried to touch her, gun fell out of defendant's coat pocket, and in ensuing struggle for gun, victim was shot twice in the neck; court observed that "[i]f the extended-term sentence statute were applied to this killing, it would be difficult to conceive of a murder to which the extended-term sentence would not apply"); *People v. Holiday* (1985), 130 Ill. App. 3d 753 (there were no acts of exceptional brutality or heinousness where, during armed robbery of dice game, defendant entered room brandishing a gun and shot victim twice in the chest).

The following cases, on the other hand, are illustrative of the type of conduct which supports a finding of exceptionally brutal or heinous behavior indicative of wanton cruelty: *People v. Jones* (1992), 236 Ill. App. 3d 244 (victim died of multiple stab wounds inflicted during robbery; trial judge concluded that victim was restrained by one defendant and tortured with knife by other defendant and that defendants had put the knife into the victim to induce him to come up with some money); *People v. Gant* (1992), 233 Ill. App. 3d 936 (extended-term sentence upheld where, during a home invasion, two residents, one of whom was fatally stabbed, were tied and handcuffed to each other in upstairs bedroom; although defendant contended he was unaware co-

defendant was carrying a knife and was downstairs when stabbing occurred, trial judge noted, *inter alia,* that defendant planned and committed a home invasion at night knowing that people were present and that there was the potential for violence and that defendant bound and threatened residents); *People v. Bliey* (1992), 232 Ill. App. 3d 606 (natural-life term of imprisonment upheld where defendant "casually and methodically" shot murder victim twice at close range with shotgun, shot another individual (who survived) in the face with a handgun, and returned to shoot murder victim twice more with shotgun); *People v. Mays* (1992), 230 Ill. App. 3d 748 (extended-term sentence for attempted murder upheld where, during robbery, defendant struck victim on the head with metal pipe and then struck victim twice more in head and mouth after he fell to the ground); *People v. Diamond* (1992), 229 Ill. App. 3d 48, 53 (defendant encouraged friend who had been shoved by victim to "stick" victim with knife and instructed another individual to block the victim's escape; when defendant's friend turned to walk away, the defendant grabbed knife and fatally stabbed victim, saying later, "[i]t was the first one and it felt good"); *People v. Fauntleroy* (1991), 224 Ill. App. 3d 140 ("execution style" killing during armed robbery after defendants determined that victim could identify one of them qualified as exceptionally brutal or heinous behavior); and *People v. Faysom* (1985), 131 Ill. App. 3d 517 (record supported natural-life sentence based on trial court's finding of brutal and heinous behavior where defendant, a panderer, shot 13-year-old prostitute three times while she begged for help).

■ We find the conduct in the case at bar to be comparable to conduct in cases where extended-term or natural-life sentences have been upheld. Mr. Snook was not merely shot, but was run down with a car while trying to flee. The forensic pathologist who conducted an autopsy on Mr. Snook detailed injuries all over his body, including bruises, lacerations and abrasions of varying severity on his face, arms, legs and torso, multiple rib fractures, fractures to the femur, tibia and fibula of the right leg, skull fractures and contusions to the brain and lungs. The extent of these injuries amply supports a finding of exceptionally brutal and heinous behavior. See *People v. Devine* (1990), 199 Ill. App. 3d 1032.

Relying on *People v. Andrews* (1989), 132 Ill. 2d 451, and *People v. Lucas* (1989), 132 Ill. 2d 399, defendant argues that the lack of evidence that the offense was premeditated undermines the trial court's finding that the offense was accompanied by exceptionally brutal or heinous behavior. Defendant contends that the evidence shows that the decision to abduct Mr. Snook was made just moments before the

actual abduction. It may fairly be inferred, however, that Goodman intended to kill Mr. Snook from the outset. The record supports a conclusion that the killing itself was not a spontaneous act. In any event, defendant's reliance on *Andrews* and *Lucas* is misplaced. While evidence of premeditation is a relevant and frequently important consideration (see *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 532), neither *Andrews* nor *Lucas* makes premeditation the *sine qua non* of exceptionally brutal or heinous behavior.

Our review of the case law suggests that the presence or absence of premeditation becomes particularly important where, considered in isolation, the actual conduct of the perpetrators during the commission of the offense might not be viewed as exceptionally brutal or heinous. (*Cf. People v. Lindsay* (1993), 247 Ill. App. 3d 518, 529 ("Several cases illustrate that an offense may be accompanied by exceptionally brutal and heinous behavior even though a narrow focus on the commission of the offense itself would not necessarily disclose such behavior (or the wanton cruelty of which such behavior is indicative").) A comparison of *Andrews* with *People v. La Pointe* (1981), 88 Ill. 2d 482, illustrates the point. In *La Pointe,* our supreme court upheld a finding that the shooting of an unarmed taxicab driver during a robbery was accompanied by exceptionally brutal and heinous behavior, emphasizing that the offense was premeditated and that the defendant exhibited callous behavior and a lack of remorse after the crime. In *Andrews* the court found an extended-term sentence to be improper where, during an armed robbery of two teenagers in a car stopped at a traffic signal, the defendant, without provocation, fatally shot the driver once in the head. Distinguishing *La Pointe,* the court noted that there was no evidence that prior to the offense the defendant indicated that he intended to kill the victim. Moreover, the defendant had expressed remorse which the trial judge found to be sincere, and had no prior history of violent crime. *Andrews* and *La Pointe* were cases where, in focusing narrowly on the conduct during the commission of the offense, it might be said that such conduct did not "go beyond the mere infliction of death." (*People v. Anderson* (1990), 201 Ill. App. 3d 75, 81; accord *People v. Hartzol* (1991), 222 Ill. App. 3d 631, 654 (noting that *Andrews* did not involve extraneous acts of brutality).) Neither case involved circumstances comparable to the infliction of suffering in the present case, where defendant was not only shot, but was also run down with an automobile and left in the road with the entirely predictable result that he was accidentally struck by another automobile. We cannot conclude that the result in

*Andrews* would necessarily have been the same if such conduct accompanied the commission of the offense in that case.

*People v. Lucas* (1989), 132 Ill. 2d 399, is similarly inapposite. There, while the killing of a seven-month-old child by his apparently intoxicated father was undeniably atrocious, the court found that the imposition of the death penalty was not warranted by the statutory factor that the victim was under the age of 12 and the death had resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(7) (now 720 ILCS 5/9—1(b)(7) (West 1992)).) The court observed that the victim's death by suffocation occurred almost immediately after the injuries were inflicted and that the injuries themselves could have been inflicted by a single blow. (*Lucas*, 132 Ill. 2d at 446.) Under these circumstances, because there was no conclusive evidence that the child's death was "either premeditated, prolonged or tortuous" it could not be said that the circumstances of the child's death were "exceptionally brutal or heinous *and* indicative of wanton cruelty." (Emphasis in original.) (132 Ill. 2d at 446.) We find no basis for comparison of *Lucas* to the case at bar. See also *People v. Mays* (1992), 230 Ill. App. 3d 748, 761 (*Lucas* inapplicable to extended-term provisions).

In *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 532, we observed that "the presence or absence of premeditation is among the most crucial considerations courts have brought to the application of [the extended-term provisions] of the Unified Code of Corrections." But we noted that such considerations also include "the amount of force used, including the infliction of torture, sadism, threats, emotional trauma *and wholly gratuitous violence.*" (Emphasis added.) (247 Ill. App. 3d at 533.) The trial court could properly view the use of a motor vehicle as a weapon to constitute gratuitous violence in the case at bar.

Relying again on his own account of the events of April 27, 1991, defendant further contends that his "reduced level of participation" in the offense counsels against a finding of exceptionally heinous or brutal behavior. This argument harkens back to the argument we have already rejected on both factual and legal grounds: that as an accomplice convicted under a common-design theory he is ineligible for a natural-life sentence based on exceptionally heinous or brutal behavior. In support of his argument, defendant cites *People v. Tibbs* (1981), 103 Ill. App. 3d 73. Defendant confuses the question of whether a defendant is eligible for a natural-life sentence with the separate question of whether, upon consideration of the factors in aggravation and mitigation, such a sentence should actually be imposed.

(See *People v. Lindsay* (1993), 247 Ill. App. 3d 518, 536-37 (Doyle, J., dissenting) ("A trial court's finding that the crime has been accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty permits but *does not require* it to consider imposing an extended-term sentence" (emphasis in original)).) In *Tibbs*, the court merely indicated that where an offense was accompanied by exceptionally brutal or heinous behavior, the extent of a defendant's participation is relevant to the trial court's ultimate decision, in the exercise of its discretion, of what sentence to impose.

Defendant next argues that, in arriving at its conclusion regarding exceptionally heinous or brutal behavior, the trial court ignored evidence of defendant's remorse and that defendant was acting under the influence of extreme emotional disturbance. Defendant also contends that the trial court gave undue weight to victim impact statements submitted in this case.

■ We find no merit in defendant's argument regarding the significance of his expressions of remorse. In *People v. Andrews* (1989), 132 Ill. 2d 451, the defendant's remorsefulness was influential under circumstances where, as noted above, the conduct during the commission of the offense was viewed as unexceptional. But in *Andrews*, unlike the case at bar, the trial court had found the expression of remorse to be sincere. (See *People v. Mays* (1992), 230 Ill. App. 3d 748, 761.) Defendant argues, however, that this court may judge for itself whether he was genuinely remorseful, since remorse is evident in his tape-recorded statement to police and in a videotaped interview with a television news reporter conducted shortly after his arrest. We disagree with defendant that the inclusion of these materials in the record on appeal alters the respective roles of the trial and appellate courts so as to permit us to substitute our judgment in this regard for that of the trial court. The trial court had the opportunity to compare the video and audio tapes with defendant's demeanor in court and to consider the expressions of remorse in light of its view of defendant's overall credibility. The trial court concluded that the show of remorse was an act and was part of defendant's strategy to place the blame on George Goodman for the lethal force used during the offense. We cannot say this conclusion was error.

■ Defendant next contends that the trial court was improperly influenced by victim impact statements submitted in connection with sentencing. Defendant notes that in announcing its sentencing decision, after describing the circumstances of the offense, the trial court stated, "[t]hese are heinous acts of exceptional brutality. I

have never heard victim impact statements that were so moving or so eloquent." Defendant's argument is premised on *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529, which held that the introduction of victim impact evidence was constitutionally impermissible where the death penalty was at issue. (But see *Payne v. Tennessee* (1991), 501 U.S. 808, 115 L. Ed. 2d 720, 111 S. Ct. 2597.) However, our supreme court has declined to extend the holding in *Booth* to a noncapital sentencing hearing. (*People v. Wilson* (1991), 143 Ill. 2d 236, 250; *People v. Turner* (1989), 128 Ill. 2d 540, 578.) In any event, we are unprepared to conclude, based only on the sequence of the trial court's comments, that its perception of exceptionally brutal or heinous behavior was in any way based on the victim impact statements, nor do we find any indication that these materials were otherwise considered in an improper manner.

Lastly, defendant contends that, in finding the murder to be accompanied by exceptionally brutal or heinous behavior, the trial court ignored evidence that at the time of the offense defendant was acting under the influence of extreme mental or emotional disturbance. Defendant notes the following excerpt from a psychological report included in the presentence investigation report:

"It is this examiner's clinical opinion that at the time of the alleged offense Mr. Charles Ratzke was suffering from an extreme emotional disturbance, i.e. a borderline personality disorder. This disorder and emotional deficit impaired his judgement as well as impaired his capacity to conform his behavior to the requirements of the law."

The report later stated:

"Mr. Ratzke's borderline personality disorder is identified *** by a pervasive pattern of instability of mood, interpersonal relationships and self image[.]

* * *

At the time of the alleged offense, Chuck Ratzke reported that he intended to steal a car to search for and impress his girlfriend whom he felt was in the process of abandoning him. In addition, Chuck Ratzke also reported that his mother had earlier refused him the use of her car. This perception of rejection from primary sources of support threatened his fragile sense of security and were the specific emotional stressors impacting his behavior at the time of the alleged offense."

The court commented:

"The fact that he thinks his girlfriend is playing around would be quite a stretch for me to find that that would be an excuse for this or something in mitigation[.] [P]erhaps to [steal] a vehicle and not to murder a man. Not to murder a man."

■ In our view, these remarks do not indicate that the court disregarded evidence of defendant's emotional or mental condition. We agree with the State that the court considered the evidence, but determined it deserved little weight in the sentencing decision given the circumstances of the case. (See *People v. Phillips* (1989), 127 Ill. 2d 499, 535.) Consideration of this mitigating factor does not automatically require a court to rule in the defendant's favor. See generally *Phillips*, 127 Ill. 2d at 535.

We also find no merit in defendant's contention, based on *People v. Isbell* (1988), 177 Ill. App. 3d 854, that his mental or emotional condition somehow precludes a finding of exceptionally brutal or heinous behavior. In *Isbell*, the defendant charged with murder was found guilty but mentally ill, and even the prosecution's psychiatric expert testified that the defendant suffered from major depression and a paranoid personality. In vacating a natural-life sentence, we found that the defendant's conduct in the commission of the offense did not rise to the level of "exceptionally brutal or heinous," and we also observed in passing that in returning a verdict of guilty of murder but mentally ill the jury recognized that defendant's conduct was not necessarily the product of a rational thought. (177 Ill. App. 3d at 869.) *Isbell* is factually dissimilar to the case at bar.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and DOYLE, JJ., concur.